726 P.2d 864

STATE of New Mexico,
Plaintiff-Appellee,

v.

Dean SHADE, Defendant-Appellant.

STATE of New Mexico,
Plaintiff-Appellee,

v.

Jim VINCENT, Defendant-Appellant.

Nos. 7731, 7792.

Court of Appeals of New Mexico.

July 24, 1986.
Certiorari Quashed Oct. 7, 1986.

Paul G. Bardacke, Atty. Gen., Ida M. Lujan, John G. McKenzie, Asst. Attys. Gen., Santa Fe, for plaintiff-appellee.

James L. Brandenburg, Brandenburg & Brandenburg, P.C., Albuquerque, for defendant-appellant Dean Shade.

Martha A. Daly, Rothstein, Bailey, Bennett & Daly, Santa Fe, for defendant-appellant Jim Vincent.

## OPINION

ALARID, Judge.

Defendants, Jim Vincent (Vincent) and Dean Shade (Shade), were tried in a single trial in district court in Lincoln County. Both defendants were named in a twenty-one-count indictment charging fraud, securities fraud, evasion of gross receipts tax, racketeering, conspiracy, embezzlement, criminal solicitation, tampering with evidence, sale of unregistered securities and attempted fraud. A jury convicted Vincent of the following: offer or sale of unregistered securities (one count); fraudulent practices with regard to offer to sell or the sale of securities (one count); criminal conspiracy (one count); criminal solicitation (two counts); and fraud over $2,500 (two counts). The same jury convicted Shade of the following: criminal conspiracy (one count); criminal solicitation (one count); and tampering with evidence (one count).

We affirm in part and reverse in part.

We will first address Vincent's claims. We will discuss the facts as they become

necessary to the arguments of both defendants. The motion for oral argument, which is pending, is denied.

## I. VINCENT'S CLAIMS

### A. WHETHER THE TRIAL COURT ERRED IN NOT DISMISSING THE CHARGES RELATED TO SECURITIES VIOLATIONS

Vincent filed a pretrial motion to dismiss, asserting that the sale of memberships in Ruidoso Condo Shares (RCS) did not constitute the sale of securities. In addition, following the presentation of the state's case, Vincent moved for the dismissal of all counts on the ground of insufficient proof. The question of whether there were securities was specifically addressed by him at the time of his motion. The trial court ruled, at trial, after deferring a ruling on the motion to dismiss, that the issue of whether time-share memberships in RCS were securities should be submitted to the jury. Vincent argues that there was no evidence to establish that time-share memberships were securities. As a matter of law, contends Vincent, the evidence failed to prove the existence of a security.

RCS was organized by Vincent for the purpose of selling time-shares in condominium units in Ruidoso, New Mexico. RCS was financed by Sierra Santa, a partnership composed of two California dentists, Dr. James Monahan, the general partner, and Dr. Tom Aspell, the limited partner. Purchasers of time-shares in RCS automatically became members of Ruidoso Condo Shares Vacation Club (RCSVC), a non-profit organization which would eventually maintain and administer the condominiums. The purchase of a time-share entitled the purchaser to a minimum of one week's use of the condominium every year for forty years. Title in the condominium property never passed to the purchaser. The owner of the property was Dr. Monahan. Vincent was in charge of the sales operations of RCS.

Sales personnel at RCS were instructed to tell purchasers that the purchase of a time-share should not be considered an investment. The contract signed by purchasers of RCS time-shares contained a provision that the purchaser was buying a time-share for personal use and not investment for profit. The contract also contained an "acknowledgement of member" which stated that all of the terms of the agreement were contained in the agreement as written.

Despite the stated policy of RCS to sell time-shares for personal use only, the evidence indicated that purchasers of RCS time-shares were induced to do so based on representations, express and implied, that RCS time-shares were a good investment. Salespeople used a "pitch book" that contained newspaper articles indicating an optimistic future for the growth and development of Ruidoso as a recreational community. The newspaper clippings in the pitch book indicated that legalized gambling was a distinct possibility in Ruidoso. Other articles listed in the pitch book indicated that top golfers would compete in Ruidoso, that a Hilton hotel would be built there, and that the real estate market in Ruidoso was very healthy. The pitch book of saleswoman Carolyn Austin contained a "timeshares comparables" chart that showed how the purchase price of time-shares bought at other locations around the world had increased greatly over relatively short periods of time. Austin testified that she would use the chart in her presentations. Both Carolyn Austin and Bonnie Hentges testified that they used a "three house drawing" in their sales presentations. During that portion of the sales presentation, the purchaser was told that once a time-share was purchased, the purchaser had a right to rent, sell or will the time-share.

Customers testified that sales personnel at RCS led them to believe any one or more of the following: RCS planned to build forty-nine condominiums; negotiations were in progress whereby membership in RCS would include membership in the Sierra Swim and Racquet Club (SSRC), but that if those negotiations fell through, comparable facilities would be provided; time pur-

chased through RCS could be exchanged for time selling for more than was paid for RCS time; time in RCS could be exchanged for time in any resort listed in catalogues made available through Resort Condominiums International (RCI) and Interval International (II); and the price of RCS time-shares would go up with time.

The former chief of the New Mexico Securities Bureau (Bureau), Bruce Kohl, testified that, in his opinion, the time-shares being sold by RCS were securities subject to regulation under state law. Kohl also testified that neither RCS nor any of its affiliated businesses ever registered with the Bureau. Two attorneys employed by Vincent during the initiation of RCS operations testified that Vincent was concerned that RCS operations in New Mexico conform to the law. On cross-examination, one such attorney, Charles Hawthorn, said that he did not believe that the time-shares sold by RCS were securities, and noted the lack of regulations specifically governing time-shares in New Mexico.

Vincent was found guilty, in part, under NMSA 1978, Section 58–13–4(A) (Repl. Pamp.1984), of the Securities Act of New Mexico.[1] The section provides that it is a felony to fail to register a security, when offered or sold, as required by the Securities Act. Certain securities are exempted from the registration requirement, but no claim is made that the exceptions apply to this case. An "investment contract" is defined as a security under Section 58–13–2(H). No issue is presented that any alternate definition of security is involved. Therefore, the question becomes whether there was sufficient evidence to establish that time-shares were investment contracts. There is no dispute over Vincent's failure to formally register the time-shares with the Bureau. We point out, furthermore, that we did not address the securities issue in *State v. Gardner*, 103 N.M. 320, 706 P.2d 862 (Ct.App.1985), involving a co-

defendant whose trial was severed from Vincent's and Shade's. We turn to a discussion of the legal test for an investment contract.

In *State v. Sheets*, 94 N.M. 356, 610 P.2d 760 (Ct.App.1980), this court recognized that Section 58–13–2(H) is of broad scope. This section provides that:

"[S]ecurity" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation, certificate of interest in oil, gas or other mineral rights, collateral trust certificate, preorganization certificate or subscription, transferable shares, investment contract, voting-trust certificate or beneficial interest in title to property, profits or earnings, or any other instrument commonly known as a security, including any guarantee of, temporary or interim certificate of interest or participation in, or warrant or right to subscribe to, convert into or purchase any of these. "Certificate of interest in oil, gas or other mineral rights" does not mean oil royalties [.]

We stated in *Sheets* that: (1) in the absence of ambiguity, statutory words are to be given effect as written, and (2) statutory words are to be given their usual, ordinary meaning, absent an expressed legislative intent to the contrary. We concluded that the statutory words "note" and "evidence of indebtedness" were to be given their ordinary and usual meanings because no legislative intent to the contrary appeared in the Act. We then held, under the facts of *Sheets*, that instruments entitled "promissory notes," which recited an amount of money to be returned to the person furnishing money to defendant, were notes and evidence of indebtedness. They were, therefore, securities under the Act.

While recognizing that the statutory definition of security does not require profit or profit sharing as a test of what is a security, this court, in *Sheets*, did not imply that

---

**1.** This case is decided under the former Securities Act, NMSA 1978, Sections 58–13–1 to –46 (Repl.Pamp.1984 and Supp.1985). All references are to the former Act. The new Act, which

repealed the old, is found at NMSA 1978, Sections 58–13B–1 to –56 (Repl.Pamp.1986). It became effective on July 1, 1986.

these factors are to be read out of the term "investment contract," which is the term before us. The ordinary, usual legal meaning of investment contract is a "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Black's Law Dictionary* 741 (5th ed. 1979). This definition is taken from *Securities & Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). We cited the *Howey* definition, in *Sheets*, as a standard definition for "investment contract," although we pointed out that "investment contract" was "only one of the meanings of 'security' ". 94 N.M. at 360, 610 P.2d at 764.

Our recognition of *Howey*, in *Sheets*, leads us now to specifically adopt the *Howey* test for determining the existence of an investment contract. We believe that the adoption of the *Howey* definition is in keeping with the ordinary meaning which has become associated with the term "investment contract."

Although the trial court did not verbalize which legal test it employed in denying the motion to dismiss, there was sufficient evidence, Vincent's arguments notwithstanding, to deny the motion based on an application of *Howey*. The trial court will be upheld if correct for any reason. *Holmes v. Faycus*, 85 N.M. 740, 516 P.2d 1123 (Ct.App.1973). We now turn to the evidence presented to determine if it satisfies the *Howey* test.

▪ As discussed, an investment contract means a contract: (1) where an individual invests his money in a common enterprise; (2) with an expectation of profits; (3) based solely on the efforts of a promoter or third party. *Howey*. "A common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *Securities & Exchange Commission v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 n. 7 (9th Cir.1973). The test is met here because the evidence

established a continuing relationship between RCS and those purchasers who invested significant sums in RCS time-shares, based on the continual services provided by RCS or Sierra Santa (the partnership that owned the condominiums). The responsibility for maintaining the condominiums for forty years was that of Sierra Santa. Such efforts by RCS or Sierra Santa were dependent on maintenance fees collected from the purchasers. Also, purchasers were told that RCS planned to acquire more condominiums. Thus, the future value of an RCS time-share would depend on the abilities of RCS to acquire the amenities and other assets it represented it was trying to acquire. In short, the benefits to the purchasers of time-shares, which benefits included the use and appreciation in value of the time-shares, largely depended on the managerial skills of the owners and managers.

▪ With regard to the second prong of the test, the evidence demonstrated that purchasers were led to expect profits, despite the formal policy of RCS to discourage the idea of investment. The promises of present and future amenities, the representations about the strength of RCS, the description of Ruidoso as a growing recreational community, and the representations that time-share units would increase in value over the years, indicated that the management and sales personnel of RCS sought to foster an expectation of profits. *See generally* Comment, *Regulating Vacation Timesharing: A More Effective Approach*, 29 U.C.L.A.L.Rev. 907 (1982).

▪ Similarly, the evidence indicated that the efforts of others shaped the expectation of profits. The critical inquiry is "whether the managerial efforts are functionally essential or undeniably significant to that profit...." *Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187, 193 (5th Cir.1979). Either RCS personnel or Sierra Santa was charged with the maintenance of the condominium units. If the units were not maintained, then, undoubtedly, the value of an RCS time-share would decrease. Additionally, RCS represented

that it was in the process of acquiring jacuzzis, health and country club memberships, as well as more condominiums, all of which would serve to enhance the value of an RCS time-share. The third prong of the *Howey* test was met. The trial court, therefore, did not err (1) in refusing to rule, as a matter of law, that no security was involved, and (2) in submitting the charges involving securities violations to the jury.

**B. WHETHER THE JURY INSTRUCTIONS WERE FATALLY DEFECTIVE BECAUSE OF FAILURE TO INSTRUCT ON THE ESSENTIAL ELEMENT OF A "SECURITY"**

█ Vincent contends, in his second point on appeal, that certain of the jury instructions failed to require the jury to make a finding that the essential element of a security was present in the case, and further failed to set forth the legal test of a security for jury deliberation. We hold there was no reversible error, because defendant failed to object or to tender his own instruction.

Instruction no. 3 reads as follows:

For you to find the Defendants Jim Vincent, Pamela Vincent and Ruidoso Condo Share Vacation Club guilty of the offer or sale of unregistered securities as charged in Count 1, the State must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. The defendants intentionally offered or sold securities, namely, time-share memberships in the Ruidoso Condo Share Vacation Club;

2. These securities were required to be registered with the New Mexico Securities Bureau by the laws of the State of New Mexico;

3. The defendants intentionally refused and failed to register these securities as required by law;

4. This happened in New Mexico between the dates of December 26, 1982, and June 1, 1983.

Instruction no. 4 reads:

For you to find the Defendants Jim Vincent, Pamela Vincent and Ruidoso Condo Share Vacation Club guilty of fraudulent practices with regard to the sale and offer to sell securities as charged in Count 3, the State must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. The defendants, directly or indirectly, intentionally and willfully:

a. employed a device, scheme or artifice to defraud; or,

b. made a false statement of material fact, or omitted to state a material fact necessary in order to make the statement made true in the light of circumstances under which they were made; or,

c. engaged in an act, practice or course of business which operated or would have operated as a fraud or deceit upon purchasers or offerees;

2. This conduct occurred in connection with an offer, sale or purchase of a security, namely a time-share memberships in Ruidoso Condo Share Vacation Club;

3. This happened in New Mexico between the dates of December 26, 1982, and June 1, 1983.

Vincent did not object to these instructions, nor did he request an instruction which contained his own definition of security. He maintains, however, that the conclusory language of both instructions which equated a security with the time-share memberships prevented the jury from finding, on its own, that the essential element of a security was present.

We agree that the question of what constitutes a "security" is one of fact. *Roe v. United States,* 287 F.2d 435 (5th Cir.1961); *see United States v. Austin,* 462 F.2d 724 (10th Cir.1972). The jury instructions at issue do not foreclose the jury, however, from finding a security. Both the state and counsel for Vincent argued to the jury that the question of the existence of a security should be determined by the jury. The instructions can be read as instructing

the jury to determine whether the transaction at issue, i.e., the time-share purchase, was a security. Instruction no. 5 (another instruction on conspiracy), in fact, simply lists the word "securities" in the elements charge without adding the phrase "namely, time-share memberships in the Ruidoso Condo Share Vacation Club." We have potentially confusing jury instructions in this case. We resolve the problem on this basis. Under these circumstances, Vincent was under a duty to object to the possibly confusing nature of the two instructions or to tender a less ambiguous instruction, and his failure to do so constituted a waiver of any error that might have been committed. *See State v. Archuleta,* 82 N.M. 378, 482 P.2d 242 (Ct.App.1970).

■ With regard to the failure of the court to instruct on the legal definition for a security under *Howey,* we are again confronted with Vincent's failure to tender his own instruction for a legal definition. While we believe that it is usually appropriate for the court to lay out the legal requirements of a security to a jury, *see United States v. Carman,* 577 F.2d 556 (9th Cir.1978), in this circumstance, any error was waived by Vincent's failure to make a clear and unequivocal request for a definitional instruction. *State v. Aragon,* 99 N.M. 190, 656 P.2d 240 (Ct.App.1982).

## C. WHETHER THE COURT FAILED TO INSTRUCT ON AN ESSENTIAL ELEMENT OF SECURITY FRAUD

Vincent claims, additionally, that Instruction no. 4 failed to include the essential element of the victim's reliance on a false statement of material fact. He, therefore, analogizes the securities fraud charge to general fraud. *See* NMSA 1978, UJI Crim. 16.30 (Repl.Pamp.1982). He claims that such failure is jurisdictional error, requiring reversal of the securities fraud conviction. *See State v. Southerland,* 100 N.M. 591, 673 P.2d 1324 (Ct.App.1983). No jurisdictional error, however, occurred.

■ Instruction no. 4 is based on Section 58–13–39(A) and tracks the statutory language. The statute provides:

A. It is a fraudulent practice and unlawful for any person, in connection with an offer, sale or purchase of any security, directly or indirectly, to:

(1) employ any device, scheme or artifice to defraud;

(2) make any false statement of material fact or to omit to state a material fact necessary in order to make the statements made true in the light of circumstances under which they are made; or

(3) engage in any act, practice or course of business which operates, or would operate, as a fraud or deceit upon any person.

This offense does not require proof of the same elements of general fraud as general fraud is defined under NMSA 1978, Section 30–16–6 (Repl.Pamp.1984). *State v. Ross,* 104 N.M. 23, 715 P.2d 471 (Ct.App.1986), explains, in detailed fashion, the reasons why securities fraud is unlike fraud. An instruction which tracks the language of Section 58–13–39(A) is sufficient when securities fraud is presented to the jury. *Ross.* A specific inclusion of the element of reliance, therefore, is not required. *See Ross.* The convictions relating to offer to sell or the sale of unregistered securities and fraudulent securities practice are affirmed.

## D. EVIDENCE OF FRAUD IN REGARD TO THE SCOTTS

Count X of the indictment charged Vincent with fraud in excess of $2,500. The fraud was related to the time-share purchase by Bob and Jan Scott. Vincent argues that the evidence was insufficient.

UJI Crim. 16.30, in defining criminal fraud, enumerates the following elements: (1) a misrepresentation of a fact by a defendant by words or conduct; (2) with the intent to deceive the victim; (3) which the victim relies upon; (4) which reliance causes defendant to obtain money or property which does not belong to defendant;

and (5) in an amount over $2,500. We review the evidence mindful of these elements.

In December 1982, Vincent contacted the Sierra Swim and Racquet Club about the possibility of making certain of SSRC's amenities available to members of RCS. This contact was broken, however, sometime between Christmas and New Year's Day, when RCS sales personnel conducted an unauthorized tour of the SSRC facilities. At this point, SSRC advised Vincent that the SSRC management wanted no further contact, or discussion, with Vincent about the use of SSRC facilities. No amenities were thus available to RCS members in 1982 and 1983.

Donald Gardner, a co-defendant, testified that he became the sales manager of RCS in December 1982. In that capacity, he was responsible for the training of sales personnel. According to Gardner, Vincent instructed Gardner, in December 1982, to train sales personnel to highlight the fact that RCS was going to supply future memberships in SSRC. Vincent himself was extensively involved in the training of Jan Lloyd, the sales representative who sold the Scotts the time-share membership.

According to Bob Scott, however, Lloyd told him, in her sales pitch, that SSRC facilities were available for present use. On cross-examination, he stated that, although he was never told he had a membership, it was his understanding that he could use SSRC without paying for such use. The Scotts entered into a contract for the purchase of a time-share with RCSVC on December 26, 1982. The purchase price exceeded $2,500. Lloyd signed the pre-printed form contract as sales representative, and Pam Vincent signed in the space entitled, "Accepted By," for her husband, Vincent. The contract, evidently approved by RCS management, contained a representation that purchasers would be presently entitled to use SSRC recreational facilities. Scott stated that the representation, repeated again in the written contract, was a factor in his decision to purchase a time-share membership.

A judgment of conviction will be upheld despite conflicting evidence if the verdict is supported by reasonable inferences flowing from the evidence. *See State v. Lankford,* 92 N.M. 1, 582 P.2d 378 (1978). Moreover, intent to defraud can be reasonably inferred from a defendant's actions. *See State v. Martinez,* 95 N.M. 795, 626 P.2d 1292 (Ct.App.1979). The above recitation of evidence established that, as of December 26, 1982, Vincent knew that no agreement had been reached with SSRC concerning facilities use. The jury could have reasonably inferred that, despite this knowledge, Vincent, as one of Lloyd's instructors, intended and directed that she "pitch" free and presently-available facilities use at SSRC. Such a pitch would improve the marketability of a time-share, and help to promote the growth of the sales program. The written contract language supports any inferences drawn about the content of the prior sales pitch. Finally, Bob Scott testified that the representation was a factor in his purchase and that he obligated his money to the management of the RCSVC under the belief that present facilities use was a component of the deal. The elements of criminal fraud, therefore, are supported by the evidence. This conviction cannot be overturned on that basis.

However, as to count X, the jury was instructed to find guilt if "defendants by any words or conduct intentionally misrepresented a fact". This instruction represents a modification of UJI Crim. 16.30, which requires proof that "defendant, by any words or conduct, misrepresented a fact to * * *, intending to deceive or cheat * * *."

Vincent claims that the modification of UJI Crim. 16.30 amounted to fundamental or jurisdictional error because the instruction failed to instruct the jury as to an essential element of the crime. The state answers that although the instruction given was not specifically as required by the UJI, the instruction given was adequate as to the element of intent.

Jury instructions must be considered as a whole, and if the jury instructions substantially follow the language of the statute or use equivalent language, they are sufficient. *See State v. Doe*, 100 N.M. 481, 672 P.2d 654 (1983). Noncompliance with the uniform jury instructions in a criminal case is reversible error if the failure eliminates an essential element of the crime or if the defendant is prejudiced. *See Jackson v. State*, 100 N.M. 487, 672 P.2d 660 (1983). There can be fundamental error if the instruction differs materially from the required instructions. *Id.*

Here, the problem presented is whether there was a material or substantive modification of UJI Crim. 16.30, or whether the instructions substantially follow the language of the statute. *See Jackson; Doe.* In *State v. Dosier*, 88 N.M. 32, 536 P.2d 1088 (Ct.App.1975), the court interpreted the requirements of Section 30–16–6 (then 40A–16–6), and held that the statute required proof of specific intent to cheat or to deceive. Here, by modifying UJI Crim. 16.30, the effect was to require proof of general intent rather than specific intent. *Cf.* UJI Crim. 1.50 (Cum.Supp.1985) (definition of general intent).

*State v. Gunzelman*, 85 N.M. 295, 512 P.2d 55 (1973), involved facts where both a general intent instruction and a specific intent instruction were given. The conviction in *Gunzelman* was affirmed, the opinion holding that reversal was not required where both intent instructions were given. However, the court pointed out the following:

> It is well settled that the crime of burglary is a crime requiring a specific mens rea. Thus, an instruction on specific intent or specific mens rea is required. When the terms of the statute itself define the requisite intent required, then an instruction which follows the words of the statute is sufficient.

*Gunzelman* at 301, 512 P.2d at 61.

It follows from this that the failure to instruct as to specific intent, when the conviction for the crime requires proof of specific intent, amounts to fundamental, reversible error. In such circumstances, the omitted instruction as to specific intent is a substantial and material omission. *See Jackson; Doe.* Therefore, the conviction of fraud with regard to the Scotts must be reversed, and a new trial granted. *State v. Otto*, 98 N.M. 734, 652 P.2d 756 (Ct.App.1982).

## E. EVIDENCE OF FRAUD IN REGARD TO IBRAHIM AL–NASSIR

Count XV of the indictment charged Vincent with fraud in excess of $2,500 as to Ibrahim and Fatmah Al-Nassir. The jury returned a verdict of guilty. Vincent again contends there was insufficient evidence to support the conviction.

The testimony of Ibrahim Al-Nassir was introduced by way of a videotaped deposition. Al-Nassir said that he was a citizen of Saudi Arabia who had been attending school in Roswell for about eighteen months at the time of the deposition. He went to Ruidoso in response to a letter from RCS telling him that he had won a gift. Upon arrival at RCS, Al-Nassir was taken on a tour where he was shown a condominium. During the sales presentation, the RCS salesman mentioned that time purchased through RCS could be traded for time in Egypt. Al-Nassir explained that his plans were to return to Saudi Arabia, that he could return to the United States only if sent by his company, but that a vacation in Egypt interested him. Al-Nassir signed a contract and tendered a down-payment for the purchase of a time-share. He was given a telephone number which would help enable him to exchange for time anywhere in Europe or Egypt. Later, upon the advice of his brother, Al-Nassir notified RCS that he wanted to cancel the contract. Upon calling RCS to advise that he wished to cancel the contract, Al-Nassir was informed that there would be no problem in cancelling. After a second call to RCS, Al–Nassir was informed that a check would be sent, but no check was sent at that time. Eventually RCS sent a check, but the check bounced.

Thereafter, Al-Nassir received a good check from an individual in San Diego.

On cross-examination, Al-Nassir said that he did not understand the contract very well when he signed. He said that a friend of his by the name of Adam accompanied him during the RCS tour and helped him fill out and read the documents related to the time-share purchase. Adam advised Al-Nassir that the purchase of the time-share was a good idea, and Adam advised Al-Nassar to purchase the time-share. Adam told Al-Nassir what the contract said.

The question that arises in this context is whether a misrepresentation occurred as to the availability of a trade for time in Europe or Egypt. The evidence demonstrates that the main reason Al-Nassir purchased a time-share was that he believed he could trade for time in Europe or Egypt.

Hans Weulfing, an employee of Resort Condominiums International (RCI), testified as to the services provided by RCI regarding the exchange of time by time-share owners, and testified as to what representations were made to him by RCS sales personnel when Weulfing posed as a prospective buyer of time-shares and recorded the encounter secretly on a tape recorder hidden on his person. Weulfing explained that RCI kept listings of space available to time-share owners who sought to trade their time for time in other places, and explained that RCI coordinated such exchanges through information contained on its computer. Resorts that sought membership in RCI were subject to a review by RCI of the quality of amenities available at the resort. Initiation fees and review fees had to be paid by the resort seeking membership before RCI would review the quality of the resort. Upon acceptance by RCI of the resort for affiliation with RCI, the resort had to pay an affiliation fee and an enrollment fee. Later, the consumer had to pay a fee when use of RCI was sought. In order to utilize the RCI system, a membership in RCI was required, and all fees had to be paid before an exchange request would be processed.

RCI had no reciprocating agreement with any other exchange company, but some resorts had affiliation with more than one exchange company.

Weulfing's inquiries at RCS occurred as a result of RCI learning that RCS was using RCI materials without authority to do so. During the presentation made to Weulfing by RCS personnel, he was told that RCS was affiliated with Exchange Network (EN), an exchange company that could exchange time with any time-share project. While on tour, Weulfing saw that a directory from the exchange company Interval International (II), as well as a directory from RCI, were shown to prospective purchasers of RCS time-shares. He was told that he could travel to any place listed in the RCI directory through EN without being a member of RCI. As far as Weulfing knew, RCS was not a member of RCI, and RCI had no agreement with EN. He explained, however, that an exchange company could contact another company that did have an affiliation with RCI, and the first company could arrange an exchange through the company affiliated with RCI. Weulfing said that such exchanges were in violation of the RCI contract, but admitted that such occurred.

Vincent testified that RCS had applied to RCI, but that he had decided to affiliate with EN when he learned that EN had access to RCI listings. Vincent said he had RCI and II directories in his possession as a result of his management of two prior time-share resorts. Vincent thought the RCI and II directories better illustrated resorts available for time-share exchange than did the EN directory, and his inquiries to EN led him to believe that he could use RCI and II material so long as purchasers knew that RCS was only affiliated with EN. In a subsequent conversation with a representative of EN, Vincent stated he was told that RCS could use RCI and II material, but it was suggested that the RCI and II photos be cut out, covered with plastic and kept as a separate booklet.

Co-defendant Donald Gardner testified, moreover, that on more than one occasion

he had called EN to verify that RCI and II listings were available though EN. On such occasions, the EN representative informed Gardner that RCI and II were available on a space availability basis.

■■■ The evidence indicates that, although RCS had no direct affiliation with RCI or II, RCS was affiliated with EN. Weulfing admitted, furthermore, that EN could actually arrange a time exchange in Europe or Egypt on a space availability basis. RCS relied on the representations of EN, and Al-Nassir, in turn, relied on the representations of RCS. Nothing indicates that Vincent should have known that EN was, in any manner, acting fraudulently with regard to RCI or II. The evidence, therefore, did not support an inference that the representations to Al-Nassir were, in fact, misrepresentations as listed under the elements of UJI Crim. 16.30. Defendant's conviction as to this charge must be reversed on the basis of failure of proof. The charges must be dismissed. *See State v. Losolla*, 84 N.M. 151, 500 P.2d 436 (Ct. App.1972).

## F. CONSPIRACY CONVICTION

Count VI of the indictment charged Vincent, in the alternative, with (1) conspiracy to commit fraud; or (2) fraudulent practices with regard to the sale or the offer to sell securities; or (3) the offer or sale of unregistered securities; or (4) tampering with evidence. The jury instruction was in conformity with NMSA 1978, UJI Crim. 28.20 (Repl.Pamp.1982), defining conspiracy. The verdict form used was a general verdict wherein the jury found Vincent guilty of "criminal conspiracy as charged in Count 6."

Vincent argues, on appeal, that there was insufficient evidence as to the alternative methods. He also argues that a failure of proof as to one of the alternative methods invalidates the general verdict under *State v. Carr*, 95 N.M. 755, 626 P.2d 292 (Ct.App.1981). Although Vincent did not request a special verdict form at trial, we review his claim because it goes to the sufficiency of the evidence to support the

verdict. *Cf. State v. DeSantos*, 89 N.M. 458, 553 P.2d 1265 (1976) (giving jury instructions on theories of murder for which there was no evidence constituted fundamental error which required a new trial).

■■■ *Carr* states that a general verdict of guilty must be set aside where it can be supported on one alternative ground but not on another, and it is impossible to tell which ground the jury selected. *See Yates v. United States*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); *State v. Cisneros*, 77 N.M. 361, 423 P.2d 45 (1967). The court, in *Carr*, let that verdict stand because either alternative ground presented in *Carr* was supported by the evidence. We agree that *Carr* controls and we proceed to review the evidence as to each of the alternative methods.

■■■ We turn, first, to conspiracy to commit fraudulent practices with regard to the sale or offer to sell securities. There was sufficient evidence from which the jury could have concluded that Vincent and Lloyd, and Vincent and Gardner, (1) by words or acts, agreed to (2) engage in practices which would, in their effect, operate as a fraud upon time-share purchasers (3) with the intent to engage in these practices. § 58–13–39(A); UJI Crim. 28.20. Section 58–13–39(A) would not require Lloyd or Gardner to have the specific intent to defraud purchasers. *State v. Ross*. It requires only that they willfully engage in practices which would have the effect of operating as a fraud. *Id.* Under a similar analysis, the evidence also supports a conspiracy between Vincent and the two sales personnel to offer or sell unregistered securities. *See State v. Shafer*, 102 N.M. 629, 698 P.2d 902 (Ct.App.1985); *State v. Sheets*.

In regard to the conspiracy to tamper with evidence, we again find substantial evidence. Tampering with evidence consists of destroying, changing, hiding, placing or fabricating any physical evidence with the intent to prevent the apprehension, prosecution or conviction of any person. NMSA 1978, § 30–22–5 (Repl.Pamp.

1984). An investigator for the New Mexico Attorney General's Office, Jim Jenkins, testified concerning the conspiracy to tamper with evidence. He said that on April 13, 1983, he received a phone call from sales representative, Bonnie Hentges, whom Jenkins had previously interviewed, and learned that co-defendant Shade had indicated that he was going to dispose of RCI and II directories. Hentges had previously testified that while talking to co-defendant Shade, he stated that Vincent told him to get rid of RCI and II books. Apparently, Vincent was in California on this day and the conversation was on the telephone. Hentges also testified that she had seen the RCI and II directories immediately before Vincent's alleged directions to Shade, but that she did not see them thereafter. Concerned about the information provided by Hentges, Jenkins went to the RCS office and asked about the RCI and II directories. Although Shade was very helpful about producing other documents that Jenkins had requested, Shade said that RCS had stopped using the RCI and II books some time previously, and they were no longer available. When Jenkins emphasized the importance of the books, Shade advised him to speak to Ron Harris, an attorney retained by RCS. No RCI or II book was produced at that time, and Jenkins left the RCS office to consult with attorneys in the attorney general's office. Later, Jenkins learned that arrangements had been made for him to pick up the books at RCS. Jenkins then called Shade, who said he would give Jenkins the books but that he needed thirty minutes to go somewhere and pick them up. When Jenkins went to RCS, he did not see Shade, but an employee then gave Jenkins the books.

Shade's wife, Mary, testified that some RCI directories had been kept in the Shade family garage. Another individual, Florine Snow, testified that on the day the directories were turned over to Jenkins, most of the RCI and II directories had been removed by her from RCS premises, but that some copies had been left behind in a file cabinet so that Jenkins could be given requested copies. Snow said that the removed copies were supposed to be taken to Shade's garage, but that they were initially taken to the office of a friend of Snow's husband.

Intent to tamper with evidence is determined from the circumstances of the case and the conduct of the defendant. *See State v. Arellano*, 91 N.M. 195, 572 P.2d 223 (Ct.App.1977). In this jurisdiction, conspiracy is complete when the prohibited agreement is reached. *State v. Davis*, 92 N.M. 341, 587 P.2d 1352 (Ct.App. 1978). Here, the evidence was sufficient to show a mutual agreement to tamper with evidence between Vincent and Shade.

We do not, however, find any evidence in this record to support a conspiracy to commit general fraud. We are mindful that, to support such a conspiracy, the evidence must demonstrate that the conspirators have the specific intent to deceive or cheat the time-share purchasers. *See* UJI Crim. 16.30. The record contains no evidence of specific intent to defraud on the part of Lloyd and Gardner, or other sales representatives, in their agreement with Vincent to pitch information. Only the specific intent of Vincent is demonstrated. The tenor of the evidence shows Vincent's intent to defraud through his instructions to sales representatives. These instructions contained material falsehoods which he, not they, knew were untrue. *See* Section D, *supra*.

Under *Carr*, the general verdict must therefore be set aside, because one alternative ground is unsupported by the evidence, and it is impossible to determine if the jury selected this ground in the verdict. A new trial should be granted on the charge of conspiracy to commit (1) fraudulent practices with regard to the sale or offer to sell securities; or (2) the offer or sale of unregistered securities; or (3) tampering with evidence. *See State v. Otto*. The charge relating to conspiracy to commit fraud is dismissed for failure of proof.

## G. SOLICITATION CONVICTIONS

Count VII of the indictment charged defendant with criminal solicita-

tion of (1) fraud, or (2) fraudulent securities practices, or (3) the sale or offer to sell unregistered securities. Count VIII added solicitation of tampering with evidence to the other three alternative methods. Vincent was convicted of both counts. Again, Vincent requested no special verdict form, but argues, in part, sufficiency of the evidence as to the alternative counts.

Criminal solicitation consists of a person soliciting, commanding, requesting, inducing, employing or otherwise attempting to promote or facilitate another person to engage in conduct constituting a felony with the intent that the person engage in conduct constituting a felony. NMSA 1978, § 30–28–3(A) (Repl.Pamp.1984). The evidence recited for Vincent's conspiracy convictions is likewise applicable to the solicitation charges.

At the very least, the evidence demonstrates Vincent requested that Gardner, and on a separate occasion requested that Lloyd, engage in fraudulent securities practices and the sale or offer to sell unregistered securities. The evidence also demonstrates, as charged in count VIII, that Vincent requested that Shade remove the directories to prevent their detection. We are not, however, directed toward any evidence that Vincent solicited or requested any other individual to commit fraud. This would have required that Vincent solicited or requested another individual to defraud time-share purchasers while having the specific intent to deceive those purchasers. § 30–28–3(A); UJI Crim. 16.30. We find no instance of this form of solicitation, and we cannot, therefore, determine upon which alternative ground the jury based its verdict. Under *Carr*, the general verdicts must be set aside. A new trial is ordered on all the alternative methods of solicitation with the exception of solicitation of fraud, which must be dismissed.

2. The *McCall* opinion that appears at 22 SBB 1098 was the second opinion of this court. The first opinion, which originally appeared at 101 N.M. 616, 686 P.2d 958, was filed June 30, 1983, but was later withdrawn. The second opinion

We note that the conspiracy and solicitation convictions must be merged for purposes of sentencing in any new trial. In interpreting NMSA 1978, Section 30–28–3(D) (Repl.Pamp.1984), this court in *State v. McCall*, 22 SBB 1098 (Ct.App.1983), *overruled on other grounds*, 101 N.M. 32, 677 P.2d 1068 (1984),[2] held that a formal adjudication of guilt of both conspiracy to commit and solicitation of the same felony was proper. We did not permit, however, the imposition of a separate sentence for solicitation of a felony when (1) a defendant is convicted and sentenced for a conspiracy to commit the felony and (2) the solicitation also constitutes the conspiracy.

## H.  MOTION FOR NEW TRIAL

Vincent argues, on appeal, that the motion for a new trial, denied by the trial court, should have been granted on the basis of unauthorized communications made to the jury. Vincent argues the present issue on appeal as if the issue presented to the trial court was whether unauthorized communications were made to the jury. However, a review of Vincent's written motion, and of the transcript of proceedings, indicates that he never claimed that the jury had been subject to unauthorized communications. Rather, the record shows that the claim asserted by him below was juror misconduct. The transcript shows that it was the state that discussed the problem presented in terms of unauthorized communication.

To preserve an issue for review, the ground or grounds upon which the objection is made in the trial court must be stated with such specificity as to alert the mind of the trial court to the claimed error or errors. *See State v. Lopez*, 84 N.M. 805, 508 P.2d 1292 (1973). Here, despite the state's argument provided to the trial court, the court was never informed by Vincent that he was asserting a claim of

was never published outside of the State Bar Bulletin, and was filed September 6, 1983. The Supreme Court overruled, in part, the second opinion.

unauthorized communication with the jury. He will not now be allowed to assert the claim on appeal. *See Lopez.*

## II. SHADE'S CLAIMS

### A. TAMPERING WITH EVIDENCE

Shade challenges his conviction of tampering with evidence. The background facts relating to the conspiracy between Shade and Vincent to tamper with evidence have been discussed. Shade claims that the evidence shows that he did nothing more than get authority from his attorney before complying with Jenkins' request for copies of RCI and II directories. We disagree.

■ We have already outlined the elements of this offense, and one of the ways to tamper is to hide the physical evidence with the requisite intent. The evidence in support of the conviction shows that on the day the directories were requested by, and turned over to Jenkins, Hentges informed Jenkins that Vincent had instructed Shade to destroy the RCI and II directories. On that day, Hentges saw RCI and II directories at RCS prior to Vincent's instructions to Shade, but Hentges saw no directories by the time she left RCS. Some directories eventually ended up in Shade's garage. Particularly probative of intent to prevent detection is evidence that: (1) the directories were initially taken to the office of a friend of Florine Snow's husband, (2) evidence of Shade's initial reluctance to comply with Jenkins' request for the directories, and (3) evidence that Shade asked for a thirty-minute grace period before turning over the directories to Jenkins. The permissible inference from the evidence is that the directories were removed from RCS premises to prevent detection during a search. That the directories were initially taken to the office of someone not affiliated with RCS also suggests intent to conceal the directories. The explanation as to why the directories were eventually turned over is based on an inference stemming from Shade's own testimony that, on the day the directories were turned over to Jenkins, Jenkins had threatened to charge Shade with withholding evidence. In short, evidence relevant to a criminal prosecution was hidden for the purpose of avoiding the prosecution. The conviction will be affirmed as to this count.

### B. SEVERANCE

Shade filed a pretrial motion for severance which was denied. The motion was addressed at a hearing conducted on September 19, 1983. The argument presented to the trial court in favor of the motion was that evidence admissible against one defendant, but not the other, would prejudice the defendant against whom the evidence was not admissible. The state responded that very little evidence could be introduced that would not serve to incriminate all defendants. The state also pointed out that the trial would last about two weeks, and urged the court not to have an additional long trial. Finally, the state argued that severance was not necessary because there was no showing of prejudice to defendant. Shade responded that he was charged with ten counts while Jim and Pamela Vincent were charged with twenty-one and twenty counts, respectively. The court announced orally that defendant's motion was denied.

■ If it appears that a defendant will be prejudiced by a joinder of defendants, the court may grant a severance of defendants. NMSA 1978, Crim.P.R. 34 (Repl.Pamp.1985). The standard of review regarding the denial of a motion to sever is whether the court abused its discretion in denying the motion; the claim of abuse of discretion must be based on a showing that defendant was prejudiced by the denial. *E.g., State v. Baca,* 85 N.M. 55, 508 P.2d 1352 (Ct.App.1973); *State v. Clark,* 83 N.M. 484, 493 P.2d 969 (Ct.App.1971). That the jury acquits the defendant of some of the charges is an indication that the jury was not prejudiced against defendant, and that the trial court did not abuse its discretion in denying a motion to sever. *See State v. McGill,* 89 N.M. 631, 556 P.2d 39 (Ct.App.1976); *State v. Sero,* 82 N.M. 17, 474 P.2d 503 (Ct.App.1970). Even if a

trial of co-defendants leads to the admission of evidence against one defendant that would not be admissible in a separate trial of the defendant seeking a severance, reversal is not required if the evidence admitted is not crucial to a determination of the guilt of the defendant seeking a severance. *See State v. Rondeau*, 89 N.M. 408, 553 P.2d 688 (1976). Moreover, a single trial of multiple defendants is proper where conspiracy is charged against all defendants. *See State v. Johnston*, 98 N.M. 92, 645 P.2d 448 (Ct.App.1982).

Shade claims prejudice in the failure of the court to grant a severance because of the evidence admitted against Vincent, showing: (1) Vincent's criminal past, and (2) that Vincent had written a number of checks rejected for insufficient funds. As to Vincent's prior criminal history, such does not serve to show that Shade was prejudiced, as this jurisdiction follows the rule that the bad reputation of co-defendants does not require severance. *See Johnston.* As to evidence of bad checks written by Vincent, such did not prejudice Shade because it cannot be said that such evidence was crucial to a determination of defendant's guilt. *See Rondeau.* Shade was convicted of conspiracy (one count), solicitation (one count), and tampering with evidence (one count). Under the circumstances, it can be said that proof that Vincent wrote bad checks did not contribute to Shade's convictions. *See Rondeau; State v. Self*, 88 N.M. 37, 536 P.2d 1093 (Ct.App. 1975) (error in the admission of evidence is grounds for reversal unless it can be said that the improperly admitted evidence did not contribute to the conviction).

As previously discussed, Shade's convictions are supported by evidence concerning the removal of RCI and II directories from RCS. Even if the jury relied on other evidence to convict Shade, such evidence includes facts showing Shade's involvement in fraud, securities fraud, or sale of unregistered securities. Because the evidence pertinent to Vincent's banking practices in no way involved Shade, such evidence could not have contributed to his conviction. *See*

*Rondeau; Self.* Thus, it cannot be said that Shade was prejudiced by the evidence of Vincent's banking practices. *See Baca; Clark.*

To the extent Shade claims the cumulative effect of evidence of Vincent's criminal history and bad banking practices served to influence the jury against him because of his association with Vincent, such a claim is negated by the jury's verdicts of acquittal as to five counts. The denial of severance was not an abuse of discretion.

## C. DENIAL OF ADMISSION OF A TAPE RECORDED CONVERSATION

Co-defendant (tried separately) Don Gardner testified during the state's case-in-chief. During cross-examination of Gardner, Shade offered as evidence a tape recorded conversation of a phone call made by Gardner to EN. The phone call was made in the presence of an investigator of the attorney general's office. The state objected to the admission of the tape recording into evidence. A tender was made out of the presence of the jury. The tape was played and revealed that Gardner had called EN and informed the person at the other end of the line that he had just visited RCS and wanted to know whether EN had access to RCI and II listings. The person at the other end of the line said that trades could be made anywhere so long as the owners were willing, depending on demand, place and time. The person at the other end of the line also said that RCI and II listings were available, and that membership in RCI or II was not necessary so long as space was available. The person explained that RCI did not charge EN any fee, and that EN did business directly with the resort rather than with RCI. One thousand resorts were said to be available with advance notice.

Shade offered the tape recording pursuant to the catchall provision for admission of hearsay expressed in NMSA 1978, Evid. Rule 803(24) (Repl.Pamp.1983). The court noted that Shade had not complied with the pretrial procedures required by the rule.

Shade then responded that the tape was offered to show what RCS was representing, and not for the truth of the matter asserted. The state countered that the tape was offered to prove the truth of the matter asserted. Shade then argued that the tape was offered for impeachment only, but the state countered that the tape was still hearsay. The court stated that the tape proved the truth of the matter asserted and noted that no hearsay exception applied. The state's objection to admission of the tape was sustained. Upon the return of the jury, Gardner testified that he had called EN, in the presence of the attorney general investigator, and testified also that he had made a similar prior call to EN on his own while working for RCS. He explained that after the calls, he understood that RCI and II listings were available to EN on the basis of space availability.

On appeal, Shade argues that the tape does not constitute hearsay, and asserts that it was offered only for the purpose of establishing that EN represented that it had access to all of the resorts illustrated in RCI and II catalogues. Shade also claims that the tape should have been admitted under Evid.Rule 803(24)(C), in the interest of justice. Although Shade admits that the procedural requirements of Evid. Rule 803(24) were not complied with, he argues that such provisions exist only to prevent surprise. Shade asserts that since the tape was the property of the state, no surprise was involved, and the procedural requirements of the rule should not control under the circumstances. Finally, Shade notes that although he was acquitted of four counts of fraud, it is impossible to speculate on what impact the exclusion of the tape may have had on the jury.

■ The proffered tape recording is admissible under *Glass v. Stratoflex, Inc.*, 76 N.M. 595, 417 P.2d 201 (1966), and *State v. Alberts*, 80 N.M. 472, 457 P.2d 991 (Ct.App. 1969). These cases instruct that extrajudicial statements are admissible if probative of some other issue in a case, such as knowledge, state of mind, good faith, rea-

sonableness, motive or the effect on the hearer. Whether the numerous co-defendants had a fraudulent state of mind was at issue in this case. The proffered tape was certainly probative of the state of mind of the hearer in this case, and was admissible as such. Since the tape was offered during cross-examination, we conclude that it was offered to clarify Gardner's testimony on direct examination. *See State v. Baca*, 81 N.M. 686, 472 P.2d 651 (Ct.App.1970).

■ Because the proffered tape was probative of state of mind under *Stratoflex* and *Alberts*, the question presented is whether failure to admit the tape amounts to reversible error. To amount to reversible error in the exclusion of evidence, Shade must show that there is a reasonable possibility that the trial court's failure to admit the evidence contributed to his conviction. *See State v. Garcia*, 100 N.M. 120, 666 P.2d 1267 (Ct.App.1983). Error in the exclusion of evidence is not reversible unless a substantial right of the defendant is affected. *Id.* No substantial right of the defendant is affected if an abundance of evidence was admitted that proved the same matter that the excluded evidence would have proved. *See State v. Brown*, 91 N.M. 320, 573 P.2d 675 (Ct.App.1977); *see also State v. Buchanan*, 76 N.M. 141, 412 P.2d 565 (1966).

■ As previously mentioned, Gardner testified on direct and cross-examination concerning phone calls he made to EN, one of which was made in the presence of an investigator from the attorney general's office. This testimony adequately went to the same matters that the excluded evidence would have proved regarding the state of mind of Shade. The exclusion did not reasonably contribute to the conviction. We conclude that there was no error in the exclusion.

## D. CONSPIRACY CONVICTION

■ Shade attacks his conviction in Count VI of criminal conspiracy to commit a fraud, or fraudulent securities practice, or the offer or sale of unregistered securi-

ties, or tampering with evidence. Like Vincent, he did not request a special verdict form, but he argues, in part, sufficiency of the evidence on appeal. He first argues that no evidence supported a conspiracy to tamper with evidence. Our review of the evidence as to the agreement between Shade and Vincent disposes of this argument. There was sufficient evidence to support a conspiracy to tamper with evidence as to Shade.

■■■■■ We similarly find evidence from which the jury could have inferred that Shade had agreed with Vincent, as a sales representative and later as a sales manager of the project, to sell unregistered securities and to engage in sales practices which had the effect of operating as a fraud upon purchasers. The fact that the substantive crimes of fraudulent practices and the sale or offer to sell unregistered securities as to Shade were dismissed by the trial court is not determinative for the conspiracy convictions. The substantive crimes and the crime of conspiracy are different, and involve separate concepts; and failure to convict on one does not prevent a conviction on the other. *See State v. Armijo*, 90 N.M. 12, 558 P.2d 1151 (Ct.App.1979).

■■■■■ However, as with Vincent, we are directed to no evidence that Shade conspired with another individual to commit fraud, which requires a specific intent to deceive on both Shade's part and the part of the other individual. UJI Crim. 28.20; UJI Crim. 16.30. We are not persuaded that Shade's participation in the conspiracy to tamper with evidence supports an inference that he also conspired to commit fraud against time-share purchasers. Only speculation would connect the two activities, and this is impermissible. Therefore, under *Carr*, the general verdict of conspiracy must be set aside because we are unable to determine upon which alternative ground the jury convicted Shade. A new trial is ordered on all the alternative grounds with the exception of conspiracy to commit fraud, which must be dismissed.

## E. SOLICITATION CONVICTION

Shade attacks his conviction under Count VIII of the indictment for criminal solicitation of (1) fraud, or (2) fraudulent securities practice, or (3) the offer or sale of unregistered securities, or (4) tampering with evidence. He alleges, generally, the insufficiency of the evidence as to these grounds.

Under *Carr*, we find evidentiary support for all the grounds with the exception of solicitation of fraud. The evidence demonstrates that Shade, as a sales representative and sales manager, promoted, facilitated and intended (1) Vincent's participation in the offer or sale of unregistered securities and (2) the various sales practices in connection with the sale of these securities. § 30–28–3(A). In terms of solicitation of tampering with evidence, the jury could have reasonably inferred that Ms. Snow's removal of the directories to another location to prevent their detection was at Shade's request. We are pointed to no evidence, however, that Shade (1) intended that Vincent, or any other individual, knowingly defraud time-share purchasers and (2) promoted or solicited this conscious defrauding. The general verdict of solicitation must be set aside, and a new trial ordered on all the alternative grounds of solicitation with the exception of solicitation of fraud, which must be dismissed.

■■■■ We note that a conviction of conspiracy to tamper with evidence and a conviction of solicitation of tampering with evidence does not foreclose separate sentences for Shade in any new trial. Separate sentences under *McCall* would be permissible (1) where the conspiracy to tamper with evidence was based on Shade's prior agreement with Vincent to tamper and (2) where the solicitation of tampering was based on Shade's subsequent request to Ms. Snow to remove the directories from the sales office. Independent evidence would then establish the separate crimes. *McCall.*

## III. CONCLUSION

In summary, Vincent's convictions of (1) the offer to sell or sale of unregistered

securities and (2) fraudulent practices with regard to the sale or offer to sell securities are affirmed. His conviction of fraud with regard to Al-Nassir is reversed, and the charge dismissed. His conviction of fraud with regard to the Scotts is reversed, and a new trial is ordered. Likewise, the conspiracy and two solicitation convictions are reversed, and a new trial is ordered as directed in this opinion.

Shade's conviction of tampering with the evidence is affirmed. His convictions of conspiracy and solicitation are reversed, and a new trial is ordered as directed in this opinion.

IT IS SO ORDERED.

BIVINS and MINZNER, JJ., concur.