809 P.2d 1278

**NEW MEXICO LIFE INSURANCE GUARANTY ASSOCIATION, et al., Plaintiffs–Appellees, and Cross–Appellants,**

v.

**QUINN & COMPANY, INC., et al., Defendants–Appellants and Cross–Appellees.**

Nos. 18651, 18680.

Supreme Court of New Mexico.

April 10, 1991.

752

W.T. Martin, Jr. Carlsbad, for defendants-appellants and cross-appellees.

Pongetti, Myers & Wilson, Floyd D. Wilson, Kevin Sweazea, Albuquerque, Victor R. Marshall & Associates, Victor R. Marshall, Joel K. Jacobsen, Albuquerque, for plaintiffs-appellees and cross-appellants.

## OPINION

RANSOM, Justice.

This matter is before the Court on interlocutory appeal and cross-appeal from the district court's order denying in part and granting in part defendants' motion to dismiss an action brought by the New Mexico Life Insurance Guaranty Association, a creature of the New Mexico Life and Health Insurance Guaranty Law, NMSA 1978, Sections 59A–42–1 to –16 (Repl.Pamp. 1988).[1] Quinn & Company had marketed and sold in New Mexico certain Single Premium Deferred Annuity Life Insurance Policies for National Equity Life Insurance Company. National Equity became insolvent and eventually failed. The Association reimbursed the policyholders for the premiums they paid for the policies and brought suit against Quinn, its officers and directors, and its selling agents, alleging

---

**1.** New Mexico adopted a new Insurance Code effective January 1, 1985, after all but a few of the transactions at issue were consummated. Since most of the statutes at issue in this case were unchanged by the 1985 legislation, we refer generally to the most recent version, citing to the original version only where a material change has occurred.

violations of the Securities Act of New Mexico, NMSA 1978, Sections 58–13–1 to –47 (Repl.Pamp.1984), the New Mexico Unfair Practices Act, commonly known as the New Mexico Unfair Trade Practices Act, NMSA 1978, Sections 57–12–1 to –16 (Orig. Pamp.1978), and the Insurance Code's unfair trade practices provisions, NMSA 1978, Sections 59A–16–1 to –30 (Orig.Pamp.1984). Additionally, the Association alleged several common law causes of action sounding both in tort and contract.[2]

The defendants raise the following issues on appeal:

1. On the question of whether the policies are securities under the New Mexico Securities Act, did the district court properly rule this to be a disputed issue of fact and, if not, were the policies insurance contracts or securities?

2. Is the Association a proper party to the action and, if so, can the Association sue for more than it paid the policyholders?

3. If the policies are deemed *insurance* securities, are the anti-fraud provisions of the New Mexico Securities Act applicable?

The Association, in turn, raises the following issues on cross-appeal:

1. With respect to Section 59A–42–13(E) of the Guaranty Law, which prohibits mention of the protections of the Guaranty Law in the sale of insurance, did the district court properly rule this section violates the first amendment to the United States Constitution?

2. Is the New Mexico Unfair Trade Practices Act applicable to transactions subject to the New Mexico Unfair Insurance Practices Act?

After careful review of the district court's order, the briefs, and the record below, we affirm in part and reverse in part.

**2.** The Association alleged the defendants had committed the torts of constructive fraud, negligent misrepresentation, and innocent misrepresentation, and that the defendants had breached their contracts with the policyholders.

**3.** Although not so stated in the statute or the legislative history, the text of the Guaranty Law

■ *Standard of review.* A motion to dismiss tests the legal sufficiency of the complaint. In considering a motion to dismiss for failure to state a claim upon which relief can be granted, we must accept as true all well-pleaded facts and question only whether the plaintiff might prevail under any state of facts provable under the claim. *Groendyke Transp., Inc. v. New Mexico State Corp. Comm'n*, 85 N.M. 718, 721, 516 P.2d 689, 692 (1973).

*The facts.* The Guaranty Law was enacted by our legislature to provide a mechanism to facilitate the continuation of coverage and to avoid financial loss to policyholders in the event of insurer insolvency. Section 59A–42–7(D).[3] The Guaranty Law establishes the Association as the principal mechanism to effectuate that purpose. Section 59A–42–2. All insurers licensed to sell insurance in New Mexico are directed to organize and remain members of the Association as a condition of their authority to transact business in New Mexico. Section 59A–42–5. The Association raises money through assessments against individual members and pays, within statutory limits, the claims of state residents against insolvent insurers that have transacted business in the state. Section 59A–42–8. The Association then has claims against the estates of the insolvent insurers. Section 59A–43–7. The New Mexico Superintendent of Insurance retains broad supervisory powers over the administration and functions of the Association. Section 59A–43–9.

National Equity was licensed in 1982 by the New Mexico Department of Insurance to sell life, accident, and health insurance in New Mexico. During the years 1982 through 1985, National Equity marketed the policies in question through Quinn, a

was taken almost verbatim from the National Association of Insurance Commissioners Model Life and Health Insurance Guaranty Association Act of 1971 (NAIC Model Act of 1971), reprinted in *Reference Handbook on Insurance Company Insolvency* 551–66 (R.J. Marcus ed.1989).

licensed New Mexico securities brokerage firm. Quinn's brokers were licensed to sell both securities and insurance in New Mexico.

Based on our review of an exemplar policy attached to the complaint, the policies worked as follows. The purchaser paid to National Equity a single premium. In return, National Equity guaranteed payment of interest at a specified rate for a period of time sufficient for the principal plus accrued interest to double the initial investment. Thereafter, National Equity guaranteed a minimum of four percent interest plus discretionary interest until the retirement date of the policy. At the retirement date, National Equity would make monthly annuity payments, "ten years certain." If the purchaser died before the payments commenced, National Equity paid the designated beneficiary an amount equal to the initial investment plus accrued interest. If the purchaser died after the payments began, the payments stopped, and the beneficiary was required to choose between certain settlement options. In either event, the entire value of the beneficiary's share was equal to the initial premium plus accrued interest. In addition, the purchaser could withdraw the cash value at any time. National Equity assessed a five percent withdrawal and surrender charge for withdrawals made during the initial doubling period. Withdrawals made thereafter were not penalized.

The Association alleges that Quinn and its agents pitched the policies as a "true alternative to a certificate of deposit." In sales literature attached to the complaint, the policies were "guaranteed to double." Among the advertised features were: guaranteed principal, freedom from probate, guaranteed interest protection, annual compounding, flexible withdrawal features, no sales charge, and no current income tax on earnings. According to the complaint, Quinn and its agents represented to potential purchasers that the Association would "stand behind" the policies issued by National Equity.

After National Equity was declared insolvent and placed in receivership, policyholders who had purchased the National Equity policies sought relief from the Association under the Guaranty Law. The Association, apparently uncertain whether the policies issued by National Equity were within the scope of the Guaranty Law, entered into a settlement agreement that was approved by the Superintendent. Pursuant to that agreement, the Association agreed to reimburse the policyholders, but for only a portion of the "contractual obligations" of National Equity. Each policyholder received the initial lump sum premium paid for the policy, and no more. In return for the payment, the Association required each policyholder to execute a Settlement, Assignment and Release Agreement. The assignment provided in part for the assignment to the Association of any claim the policyholder may have against National Equity and others arising out of the sale of the policies. In addition, the assignment provided the Association would be subrogated to all of the policyholder's rights against National Equity, Quinn, and any other person. The Association brought this action as both assignee and subrogee pursuant to the plenary assignments.

In its complaint the Association asserted the policyholders were damaged in an amount equal to their premiums plus any interest due, and the Association sought the $3,412,519.15 it had paid to the policyholders, plus prejudgment interest that had accrued and would accrue on that amount, costs, attorney fees, and, significantly, other unspecified damages to be proved at trial.

*Whether the policy is a security cannot be decided in this case on a motion to dismiss.* The defendants' motion to dismiss alleged that because the policies were not securities, the Association had failed to state a claim under Section 58–13–39, the anti-fraud provisions of the New Mexico Securities Act. In its order, the district court held that the question of whether the policies were securities for purposes of the

New Mexico Securities Act was a disputed question of fact. For the reasons set forth below, we agree with the district court's assessment of the question.

■ At the outset we note, however, that the question of whether a particular arrangement is a security for purposes of the New Mexico Securities Act is a question of law ultimately to be determined by the court.[4] In this regard, we are in agreement with the unanimous body of federal and state law. *Sheets v. Dziabis*, 738 F.Supp. 307 (N.D.Ind.1990) (whether a particular arrangement is an investment contract under the federal definition is a question of law); *Vairo v. Clayden*, 153 Ariz. 13, 18, 734 P.2d 110, 115 (Ct.App.1987) (whether a particular instrument is a security under the state securities law is a question of law); *Leyva v. Superior Court*, 164 Cal.App.3d 462, 470, 210 Cal.Rptr. 545, 549 (1985) (same); *Straub v. Mountain Trails Resort, Inc.*, 770 P.2d 1321, 1323 (Colo.Ct. App.1988) (same); *Lambrecht v. Bartlett*, 656 P.2d 269, 271 (Okla.1982) (same). Nevertheless, resolution of the question well may require presentation of facts and evidence sufficient to permit sound decisionmaking by the court.

**4.** We are mindful that the court of appeals in *State v. Shade*, 104 N.M. 710, 726 P.2d 864 (Ct.App.), *writ quashed*, 104 N.M. 702, 726 P.2d 856 (1986), concluded that the question of whether a contract is a security is one of fact in criminal actions brought under the New Mexico Securities Act. Although we question the continuing validity of that part of *Shade*, we do not, at this time, overrule that case because of the particular interests and concerns at work in a criminal prosecution under the New Mexico Securities Act about which we are not concerned today.

**5.** While the courts of this state have examined the definition of a security under the New Mexico Securities Act in the context of products not purportedly insurance, *see, e.g., State v. Sheets*, 94 N.M. 356, 610 P.2d 760 (Ct.App.), *cert. denied*, 94 N.M. 675, 615 P.2d 992 (1980) (promissory notes); *State v. Shade*, 104 N.M. 710, 726 P.2d 864 (Ct.App.), *writ quashed*, 104 N.M. 702, 726 P.2d 856 (1986), New Mexico courts have not addressed the status of any insurance-like product under the New Mexico Securities Act. For that reason, we are inclined to look to the long line of federal authority on the subject.

■ The SEC recently adopted Rule 151 which provides a safe harbor from federal securities registration requirements for certain annuity contracts that satisfy the rule's conditions. 17 C.F.R. § 230.151 (1989). In order to be eligible to rely on Rule 151, a contract must (1) be an annuity or optional annuity contract issued by an insurance company; (2) include certain guarantees of principal and interest sufficient for the insurer to be deemed to assume the investment risk; and (3) not be marketed primarily as an investment. To establish that the insurer has assumed sufficient investment risk under part two of the rule, (1) the value of the contract may not depend on the investment performance of a separate account; (2) the insurer must guarantee principal and interest credited thereto and credit a specified rate of interest to purchase payments and interest credited thereto; and (3) the rate of discretionary excess interest may not be modified more frequently than once per year. *Id.*

We agree with the parties that Rule 151 constitutes a test for determining whether an instrument is to be treated as a security.[5] Nevertheless, we are mindful of the SEC's position that Rule 151 is not a litmus

Moreover, we think the federal cases and regulations construing annuities and other insurance products are controlling. Annuities, in their many forms, have achieved a high level of popularity with consumers nationwide. While variable annuities long have been subject to SEC regulation, *SEC v. Variable Annuity Life Insurance Co.*, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959), the status of fixed annuities under federal law is currently developing. The SEC has responded with Rule 151, in an attempt to clarify the registration requirements for new annuity products. To better serve the smooth flow of interstate commerce in these products, and to foster a healthy business climate in this state, we now adopt federal precedent in construing the New Mexico definition of "security" in cases implicating annuity products. Otherwise, potential New Mexico offerors of the products would face the uncertainty of what may be different legal requirements in this state.

While much of the federal law has developed in response to the exemption from registration requirements under the federal securities act, 15 U.S.C. § 77c(a)(8) (1981) (exempting "any insurance or endowment policy or annuity contract"), many cases have applied the law devel-

test for determining when a contract is a security. Thus, we conclude that the proper analysis of the policies in this case must include a two-step process. First, the court must ask whether the instrument satisfies each of the three elements of Rule 151. An affirmative answer relegates the instrument to "non-security" status for purposes of the New Mexico Securities Act. Should the instrument fail the Rule 151 test, the court must then embark on further analysis to determine whether the instrument is a security. In this second stage, the appropriate test is that articulated by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 *reh'g denied*, 329 U.S. 819, 67 S.Ct. 27, 91 L.Ed. 697 (1946): A security means "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party...." *See State v. Shade*, 104 N.M. 710, 716, 726 P.2d 864, 870 (Ct.App.) (adopting *Howey* test) *writ quashed*, 104 N.M. 702, 726 P.2d 856 (1986). The court must place substance before form and it must examine in detail the nature of the transaction. The "economic realities" must be examined to determine whether the transaction warrants characterization as a security. If the function of the transaction is not related to the need for securities regulation the transaction will be excluded. *Bradford v. Moench*, 670 F.Supp. 920, 931 (D.Utah 1987); *see also SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 211–12, 87 S.Ct. 1557, 1562, 18 L.Ed.2d 673 (1967) (examining contract in functional context). As the Supreme Court stated in *Howey*, 328 U.S. at 299, 66 S.Ct. at 1103, the term security "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."

■ Applying these principles to the policies in the instant case, we conclude the district court properly held that the legal status of the policies involves disputed issues of fact. The first element of Rule 151 is satisfied; the policies were issued by National Equity, an insurer regulated and licensed under the New Mexico Insurance Code. The second prong of Rule 151 asks whether the insurer bore the investment risk under the policy. Under the National Equity plan, the policyholder paid an initial lump sum to National Equity in return for the promise to pay a specified rate of interest until the value of the initial premium plus accrued interest was twice the initial investment. Interest accrued from the initial date of the policy until the projected doubling date based on the stated interest rate. The policies guaranteed interest at the specified rate for the entire doubling period, and additionally guaranteed a minimum rate of four percent thereafter. The guaranty, to the extent it was the promise of National Equity and not the guaranty of the Guaranty Law, effectively shifted all of the investment risk to National Equity. Accordingly, the second part of the Rule 151 test is satisfied.

The third part of Rule 151 considers whether the contract was marketed primar-

---

oped in that context to determine whether an insurance product is a "security" for purposes of the anti-fraud provisions. *See, e.g., Associates in Adolescent Psychiatry v. Home Life Ins. Co.*, 729 F.Supp. 1162 (N.D.Ill.1989). True, the New Mexico Securities Act registration exemption is of a different sort. Nevertheless, we think the same policies and rationale behind exempting insurance products from federal regulation similarly must inform our analysis of the New Mexico Securities Act: " '[A] savings account or insurance policy, like a corporate bond, subject the investor to some risk of capital loss in return for a relatively fixed return. These transactions are explicitly exempted from the registration requirements of the 1933 Act, 15 U.S.C. § 77c, not because investors do not need protection, but because other agencies regulate the institutions involved.' " *American Mut. Reinsurance Co. v. Calvert Fire Ins. Co.*, 52 Ill.App.3d 922, 929, 9 Ill.Dec. 670, 676, 367 N.E.2d 104, 110 (1977) (quoting *El Khadem v. Equity Securities Corp.*, 494 F.2d 1224, 1230 (9th Cir.), *cert. denied*, 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974)), *cert. denied*, 436 U.S. 906, 98 S.Ct. 2238, 56 L.Ed.2d 404 (1978)). Thus, as here, where the New Mexico Department of Insurance in fact has regulated a product, we are less inclined to believe the legislature intended yet another layer of regulation.

ily as an investment. Here, one inclined to agree with the defendants, that the policies at issue were marketed primarily as insurance and not as an investment, still cannot say, based solely upon an examination of the pleadings and attachments, that the Association will be unable to tender facts sufficient to support a claim to the contrary.

Relying upon advertising materials attached to the complaint, the Association argues that the primary thrust of the defendants' marketing campaign was directed toward the tax-deferred aspects of the product and, as a consequence, that the policies were marketed primarily as investments. In *Associates in Adolescent Psychiatry v. Home Life Insurance Co.*, 729 F.Supp. 1162 (N.D.Ill.1989), however, addressing the scope of investment-oriented marketing permitted under Rule 151, that court recently stated that the insurer's promoting of the tax-favored features of a plan "is simply a consequence of the [policy's] nature ·as ·a retirement funding vehicle." *Id.* at 1174. The court went on to state that " '[a] marketing approach that fairly and accurately describes both the insurance and investment features of a particular contract, and that emphasizes the product's usefulness as a long-term insurance device for retirement or income security purposes, would undoubtedly "pass" the rule's marketing test.' " *Id.* (quoting Definition of Annuity Contract or Optional Annuity Contract, Securities Act Release No. 6645, [1986–87 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 84,004, at 88,137 (May 29, 1986)). We agree.

■■■ Thus, we cannot simply cull isolated passages from the proffered sales literature and conclude that the marketing techniques promote the policies primarily as investments. Rather, we must examine the marketing methods as a whole, and ask whether those methods promote the policies primarily as investments. It is true that the exhibits attached to the complaint tout many investment features of the policies: tax deferred interest accumulation, seven day liquidity, and high interest. At the same time, however, the insurance and retirement funding aspects of the policies are promoted. The advertisements refer to the non-probate character of the policies and the death benefit available to beneficiaries. Additionally, the safety and security of the policy is highlighted by references to guaranteed principal and interest. We do not know whether the exhibits constitute the entirety of the marketing program. It is possible that the promotions when considered in their entirety would yield quite a different result from that reached by simple examination of the exhibits attached to the complaint. While this issue well may be decided on an appropriate motion for partial summary judgment, it cannot be decided on a motion to dismiss.[6]

■■■ *The Association is a proper party.* The district court concluded that the Association was a proper party plaintiff and had the appropriate statutory authority to bring this action. The district court also found that the assignments given by the policyholders to the Association were valid contracts and that, pursuant to such assignments, all claims and causes of action of any kind that the policyholders had or could have asserted against the agents properly had been assigned to the Association. We agree. In our view, the authority of the Association to sue under the plenary assignments turns on the power of the Association to enter into the assignments in the first instance. Because we believe the Association is empowered to enter into such assignments, we hold it is, by implication, authorized to sue pursuant to the assignments.

The Association may sue or be sued and may enter into contracts necessary to carry

---

6. We note here that the public perception of the policies does not control the question of whether they were marketed primarily as investments. On this issue, we agree with the court in *Adoles-* *cent* that Rule 151 "merely asks how the insurer promoted" the policy, not how the public perceives it. *Adolescent,* 729 F.Supp. at 1175.

out the purposes of the Guaranty Law. Section 59–22–8(D)(3), (4). The policyholders may sue the Association to recover under the provisions of the Guaranty Law. If the coverage of the policy under the Guaranty Law is in dispute, nothing in the Guaranty Law prohibits the Association or the policyholders from reaching a settlement concerning coverage of the disputed policies. Indeed, such a settlement is squarely within the express powers of the Association to enter into contracts necessary to carry out the purpose of the Guaranty Law. *See* Section 59A–42–7(D)(4). Settlement advances the loss avoidance purpose of the Guaranty Law by providing the policyholders with reimbursement under their contracts. The power to contract and to settle must include the trade of rights and obligations between the respective parties to the settlement. Because the Association is empowered to enter into the assignments at issue, we feel it fairly must be implied from the express powers that the Association is empowered to sue pursuant to the assignments.

Defendants specifically challenge the statutory authority of the Association to sue pursuant to the assignments. Defendants rely on Section 59A–42–7(E) that provides:

> Any person receiving benefits under this article shall be deemed to have assigned his rights under the covered policy to the association to the extent of the benefits received whether the benefits are payments of contractual obligations or continuation of coverage. The association

may require an assignment to it of such rights by any payee, beneficiary, insured or annuitant as a condition precedent to the receipt of any rights or benefits conferred by this article. The association shall be subrogated to these rights against the assets of any insolvent insurer.

■ Defendants contend that the assignments are invalid because they give more rights to the Association than it is authorized to require under Section 59A–42–7(E). Defendants apparently interpret the second sentence of that section to prohibit the Association from requiring an assignment of rights beyond the extent of the benefits to be paid. Defendants' interpretation cannot withstand logical scrutiny. That second sentence does not impair the authority of the Association to require, as a condition of settling a disputed claim, an assignment of any rights or interests the policyholder may have as purchaser or owner of the policy. Rather, we read Section 59A–42–7(E) not as a limitation, but as an authorization for the Association to precondition payments required under the Guaranty Law. That section does not in any way purport to circumscribe the entire universe of permissible suits and recoveries permitted the Association as assignee. Had our legislature intended that section to limit the power of the Association to require by assignment only the policyholder's "rights under the covered policy" to the extent of benefits received, then surely the legislature would have employed restrictive language rather than permissive.[7]

---

7. We need not decide today whether the phrase "rights under the covered policy" is intended to include only rights expressly created by the policy. Nevertheless, we note that the NAIC Model Act of 1971, after which the Guaranty Law was patterned, was adopted by the National Association of Insurance Commissioners in 1971 in response to public concern over insurer insolvencies. The official commentary to the NAIC Model Act of 1971 offers no insight into the nature of the Association's rights as assignee. *See* NAIC Model Life and Health Insurance Guaranty Association Act, § 8(9)(a) (1971), reprinted in *Reference Handbook on Insurance Company Insolvency* 551 (R.J. Marcus ed.1989).

Interestingly, the NAIC revised that section of the Model Act corresponding to Section 59A–42–7(E) in 1985. The Model Act now provides that:

> Any person receiving benefits under this Act shall be deemed to have assigned the rights under, *and any causes of action relating to,* the covered policy or contract to the Association to the extent of the benefits received under this Act.... (emphasis added).

Section 8(m)(1), NAIC Life and Health Guaranty Association Model Act (1985), reprinted in *Reference Handbook on Insurance Company Insolvency* 584, 593 (R.J. Marcus ed.1989).

While it is difficult to ascribe legislative intent retroactively based on subsequent changes in

■ *The Association may sue for more than it paid the policyholders.* Consequently, we agree with the district court that the Association was entitled, pursuant to the assignments, to sue for the entire amount of any and all claims held by the policyholders. The defendants have not pointed to any other specific part of the Guaranty Law limiting the Association's right of recovery as assignee of the policyholders' rights. Similarly, there is nothing in the Guaranty Law abrogating the statutory right to attorney fees under the New Mexico Securities Act, Section 58–13–42, to prejudgment interest, Section 56–8–3, –4, or the prevailing party's right to costs, SCRA 1986, 1–054(E). Accordingly, we find no impediment to the Association's action for all damages, fees, interest, and costs it has sought.

■ *The anti-fraud provisions of the New Mexico Securities Act properly may be invoked.* The third issue is the applicability of the anti-fraud provisions of the New Mexico Securities Act to securities issued by an insurance company. Should the policies be deemed securities, the defendants contend that they must then be deemed insurance securities subject to exclusive regulation by the Superintendent. The defendants offer two arguments in support of their position.

The defendants initially contend that securities issued by an insurance company are exempt from all of the provisions of the Securities Act of New Mexico by virtue of Section 58–13–29(C)(3). The defendants, however, mischaracterize that section. The first sentence of Section 58–13–29 provides that "[t]he provisions of Sections 58–13–4, 58–13–5, 58–13–7 and 58–13–8 NMSA 1978 do not apply" to the securities listed in that section. The sections enumerated in the first sentence concern only the registration requirements under the Securities Act of New Mexico, not the anti-fraud provisions contained in Section 58–13–39. Section 58–

13–29 exempts from the registration requirements certain securities, but does not by its express terms exempt those securities from the anti-fraud provisions of the New Mexico Securities Act. Accordingly, Section 58–13–29(C)(3) does not bar a claim based on fraudulent practices in connection with the sale of insurance securities.

■ The defendants further argue that the exclusive jurisdiction of the Superintendent to regulate the sales of insurance securities effectively precludes a private cause of action for fraud under the New Mexico Securities Act. It is true that the Superintendent has exclusive jurisdiction to regulate the sale of insurance securities. Section 59–13–7 (repealed 1988). That section, however, does not expressly eliminate the private causes of action available under the anti-fraud provisions of the Securities Act of New Mexico. Nor does a private cause of action under the Securities Act of New Mexico conflict with the provisions of the Sale of Insurance Securities Act. Absent an explicit legislative intent to preclude a legislatively created cause of action or a direct conflict between distinct code sections, we cannot judicially repeal a right of action that the legislature has created.

*Section 59A–42–13(E) of the Guaranty Law unconstitutionally restricts commercial speech.* The Association cross-appeals the order of the district court granting in part defendants' motion to dismiss. The order held Section 59A–42–13(E) that prohibits the use of the Guaranty Law in the sale of insurance is unconstitutional "insofar as it purports to apply to" the communication of information about the protections of the Guaranty Law, "which information is, in all respects truthful, and which is not deceptive or misleading." At the same time, the district court held the statute constitutional as applied to statements "which are in any way false, misleading or deceptive." Section 59A–42–13(E) makes it "a prohibited unfair trade

model legislation, we interpret this change as clarification that the drafters of the Model Act intended more than simply the rights created

under the policy to inure to the benefit of the Association.

practice for any person to make use in any manner of the protection afforded by the [Guaranty Law] in the sale of insurance." Copies of Quinn's sales literature attached to the complaint state that principal and interest under the annuity contracts are "guaranteed." Additionally, the Association alleges the agents represented to prospective purchasers of the policies that the Association would guaranty the policies. Based on those allegations, the Association invokes the per se prohibition of Section 59A–42–13(E) as a basis for its unfair trade practices claim.

The parties agree that the speech here proposes a commercial transaction and, thus, should be classified as "commercial speech." *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). Commercial speech has been afforded the protections of the first amendment. *See, e.g., Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Nevertheless, while content based restrictions on noncommercial speech are sustained only in the most extraordinary circumstances, such restrictions on commercial speech are less problematic. *Bolger*, 463 U.S. at 64–65, 103 S.Ct. at 2879; *Curtis v. Thompson*, 840 F.2d 1291, 1298 (7th Cir.1988) (because of the greater potential for deception or invasions of privacy in the context of advertising methods, content based restrictions on commercial speech are more often upheld).

The precise protection available to a particular type of expression "turns on the nature both of the expression and of the governmental interests served by its regulation." *Central Hudson*, 447 U.S. at 563, 100 S.Ct. at 2350. Constitutional scrutiny of state regulation of commercial speech takes the form of the four part balancing process of *Central Hudson*. The *Central Hudson* Court explained:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it

at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566, 100 S.Ct. at 2351.

The threshold *Central Hudson* inquiry asks whether the speech concerns lawful activity and is not misleading. Once that is established, the speech is entitled to first amendment protection, and the government bears the burden of justifying its restrictions. *Board of Trustees v. Fox*, 492 U.S. 469, 469, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388 (1989); *Central Hudson*, 447 U.S. at 564, 100 S.Ct. at 2350 (if the communication is not misleading the State must assert a substantial interest and demonstrate that the regulatory technique is proportionate to that interest).

 In its reply brief, the Association argues that a fact issue precludes our resolution of this threshold issue. The Association urges that we cannot determine, without further factual inquiry beyond the scope of the pleadings, whether Quinn's mention of the protections of the Guaranty Law in connection with the sale of the policies was misleading or not. While we agree that the constitutionality of Section 59A–42–13(E), *as applied*, ultimately depends upon the factual matrix from which the transactions arose, we see the ruling that is before us on interlocutory appeal as being a pure question of law. Is the statute unconstitutional as applied to information that is in all respects truthful, and which is not deceptive or misleading; and is it constitutional as applied to statements that are in any way false, misleading, or deceptive? The resolution of the issue of fact does not resolve the correctness of the district court's ruling. The question of the constitutionality of the statute as applied is reached in either event. By adopting the threshold *Central Hudson* test, we have

answered whether the statute is constitutional as applied to statements that are in any way false, misleading, or deceptive. It is. Accordingly, we will address the constitutionality of Section 59A–42–13(E) as applied to lawful and truthful statements, and we will consider the Association's contentions that the regulation directly advances a substantial state interest without unnecessary restrictions on free speech.[8]

■■■ We agree with the Association that the second part of the *Central Hudson* test is met. The second part of the test involves an assessment of the strength of the state's interest in restricting the speech. The Association offers several purposes sought to be achieved by the disclosure ban. The asserted purposes are, however, simply different ways of stating the same principle. The Association asserts that the ban encourages insurance purchases from financially sound companies by discouraging consumer reliance on the strengths of the Guaranty Law. Consumer choice, untainted by knowledge of the "insurer of last resort," is the best guarantor that financially sound insurers will prevail over their lesser competitors. Thus, the prohibition could be said to promote the state's interest in protecting consumers from unsafe and unsound insurance companies. We have little trouble recognizing the substantial nature of this interest. The state long has regulated the business of insurance pursuant to its police powers. Indeed, it is beyond peradventure that protection of consumers from unsafe

and unsound insurance companies is a substantial state interest. Accordingly, the second part of the *Central Hudson* test is met.

The third part of the *Central Hudson* presents the real problem for us. We find it difficult to fathom how the prohibition of disclosure of the Guaranty Law in the sale of insurance directly advances the state's interest in protecting consumers from unsafe and unsound insurance companies. We are mindful that the third *Central Hudson* inquiry does not require that we substantively evaluate the propriety of the means chosen by the state; rather the question is whether the "means chosen by the legislature, however objectionable any court may find them, directly advance the asserted state interest." *Oklahoma Telecasters Ass'n v. Crisp*, 699 F.2d 490, 500 (10th Cir.1983) (state prohibition against broadcasting of advertisements for alcoholic beverages does not violate First Amendment rights of broadcasters), *rev'd on other grounds*, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984). Certainly the state has at its disposal numerous direct methods of policing the soundness of insurance companies transacting business in this state. Our insurance code is replete with instances of regulations directly protecting consumers from unsafe and unsound insurance companies. *See, e.g.,* Sections 59A–8–1 to –16 (assets and liabilities of insurers subject to state scrutiny); Sections 59A–5–1 to –33 (insurers must receive certificate of authority to transact business in state). The disclosure prohibition seeks to promote

---

**8.** Whether the speech in the instant case is entitled to first amendment protection depends on whether Quinn's alleged declarations that the Guaranty Law would insure the policies were true and not misleading. It is for the court to determine whether the policies came within the coverage of the Guaranty Law. It matters not that coverage was denied in fact by the Association and that the policyholders settled with the Association for less than full coverage. The question is whether the policies were in law within the coverage provisions of the Guaranty Law. If they were not, the statute would be constitutional as applied; and for false statements to the contrary the Association may invoke the statute's per se prohibition. If the

policies were within the coverage provisions of the Guaranty Law, and the statements were in all respects truthful, then the efficacy of the statute depends upon our resolution of whether it directly advances a substantial state interest without unnecessary restrictions on free speech. We note that we have considered, but find we do not have before us, the question that there may be fact issues for the jury on whether the statements were "in all respects truthful." Also, we do not have before us any question of the causes of action left to the Association if the court, on remand, finds the policies were not securities and that they came within the coverage of the Guaranty Law.

sound insurance companies on the assumption that consumer choice will be impaired by knowledge of the existence of the fund's protections. Even granting the speculative premise that consumers will be less vigilant in their investment decisions when fully informed of the protections of the Guaranty Law, we fail to see a direct nexus between prohibiting disclosure and promoting sound insurers. Rather, only circuitously does suppression of the information available to consumers promote the state's asserted interest. Surely, this indirect nexus is not a constitutionally adequate reason to restrict protected speech.

Furthermore, we think the observations of the Supreme Court in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 770, 96 S.Ct. 1817, 1829, 48 L.Ed.2d 346 (1976), are particularly appropriate here:

> There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them.

In this case the state has chosen to restrict rather than to open the channels of communication, in an indirect attempt to secure the best results for the public. Moreover, the Association has failed to adequately demonstrate good reasons for the ban. Accordingly we hold that upon determination that the speech in the instant case was lawful and not misleading, Section 59A–42–13(E) is unconstitutional and void as applied to that speech.

■ *Causes of action may be maintained under both the New Mexico Unfair Trade Practices Act and the New Mexico Unfair Insurance Practices Act.* Reasoning that because these transactions were within the purview of the Unfair Insurance Practices Act, NMSA 1978, Sections 59A–16–1 to –30, the district court found that the New Mexico Unfair Trade Practices Act, NMSA 1978, Sections 57–12–1 to –16, did not apply to the instant action. Both parties concede, however, that *State ex rel. Stratton v. Gurley Motor Co.*, 105 N.M. 803, 737 P.2d 1180 (Ct.App.1987), resolves the issue. In that case the court held that the legislature "did not intend to make the Unfair Insurance Practices Act the exclusive remedy under state law for conduct prohibited in that Act." *Id.* at 806, 737 P.2d at 1183. Based on the authority of *Gurley Motor*, we reverse that part of the district court's order which found the Unfair Trade Practices Act inapplicable to the instant action.

Based on the foregoing, we affirm in part and reverse in part the district court's order.

IT IS SO ORDERED.

MONTGOMERY and FRANCHINI, JJ., concur.