2001-NMSC-034

34 P.3d 1148

**Michelle DELGADO, as personal representative of the estate of Reynaldo Delgado, individually, and as the parent of Danielle Delgado, a minor child, and Gabrielle Delgado, a minor child, Plaintiff–Petitioner,**

v.

**PHELPS DODGE CHINO, INC., a Delaware corporation, Charlie White, individually and in his corporate capacity, and Mike Burkett, individually and in his corporate capacity, Defendants–Respondents.**

No. 26,360.

Supreme Court of New Mexico.

Oct. 29, 2001.

274

McGinn & Associates, P.A., Randi McGinn, Clay Campbell, Albuquerque, NM, for Petitioner.

Silva, Reider & Maestas, P.C., Paul Maestas, Christopher A. Riehl, Albuquerque, NM, for Respondents.

Carpenter & Chavez, William H. Carpenter, David Stout, Michael B. Browde, Albuquerque, NM, for Amicus Curiae New Mexico Trial Lawyers Association.

Sandenaw, Carrillo & Piazza, P.C., Leonard J. Piazza, Las Cruces, NM, for Amicus Curiae New Mexico Defense Lawyers Association.

## OPINION

FRANCHINI, Justice.

{1} Reynaldo Delgado died following an explosion that occurred at a smelting plant in Deming, New Mexico, after a supervisor ordered him to perform a task that, according to Petitioner, was virtually certain to kill or cause him serious bodily injury. Respondents allegedly chose to subject Delgado to this risk despite their knowledge that he would suffer serious injury or death as a result. Delgado's widow brought a number of tort claims against Phelps Dodge and the individual supervisors who allegedly caused Delgado's death. The trial court dismissed the case on the grounds that the Workers' Compensation Act ("the Act") provides the exclusive remedy for Delgado's death, and that Respondents therefore enjoy immunity from tort liability. The Court of Appeals upheld that ruling in a memorandum opinion. *See Delgado v. Phelps Dodge Chino, Inc.,* NMCA 20,972, slip. op. (May 3, 2000). We granted certiorari to determine whether Respondents' behavior falls within the Act's exclusivity provisions. Our review of the Act reveals that it is effectively silent on the scope of employer exclusivity. Unequipped with legislative guidance on the matter, we apply NMSA 1978, § 52-5-1 (1990) and conclude that worker and employer rights under the Act must be subject to the same standard of conduct and equivalent consequences for misconduct. Accordingly, we reject the "actual intent test" and hold that when an employer willfully or intentionally injures a worker, that employer, like a worker who commits the same misconduct, loses the rights afforded by the Act. *See* NMSA 1978, § 52-1-11 (1989). For purposes of the Act, willfulness occurs when: (1) the worker or employer engages in an intentional act or omission, without just cause or excuse, that is reasonably expected to result in the injury suffered by the worker; (2) the worker or employer expects the injury to occur, or has utterly disregarded the consequences of the intentional act or omission; and (3) the intentional act or omission proximately causes the worker's injury. We reverse the Court of Appeals and remand to the trial court to apply the test we adopt today.

### I.

{2} In reviewing a trial court's decision to grant a motion to dismiss under Rule 1-012(B)(6) NMRA 2001, we accept as true all facts properly pleaded. *See N.M. Life Ins. Guar. Ass'n v. Quinn & Co.,* 111 N.M. 750, 753, 809 P.2d 1278, 1281 (1991). For purposes of this appeal, we therefore accept as true the following facts, which were properly pleaded in Petitioner's complaint.[1]

{3} In the summer of 1998, thirty-three-year-old Reynaldo Delgado resided in Deming, New Mexico, with his wife, Petitioner Michelle Delgado, and two minor children. Mr. Delgado had been working at the Phelps

---

1. Respondents argue that we must limit our review to those facts alleged on the face of the complaint, while Petitioner suggests that we may consider facts submitted outside the complaint that were not considered by the trial court. Because we find the facts alleged in the complaint sufficient to resolve the case, we decline to rule on this issue.

Dodge smelting plant in Hurley, New Mexico, for two years. The smelting plant distills copper ore from unuseable rock, called "slag," by superheating unprocessed rock to a temperature in excess of 2,000 degrees Fahrenheit. During the process, the ore rises to the top, where it is harvested, while the slag sinks to the bottom of the furnace where it drains through a valve called a "skim hole." From there, the slag passes down a chute into a fifteen-foot-tall iron cauldron called a "ladle," located in a tunnel below the furnace. Ordinarily, when the ladle reaches three-quarters of its thirty-five-ton capacity, workers use a "mudgun" to plug the skim hole with clay, thus stopping the flow of molten slag and permitting a specially designed truck, called a "kress-haul," to enter the tunnel and lift and remove the ladle.

{4} On the night of June 30, Delgado's shorthanded work crew, under the supervision of Mike Burkett and Charlie White, was being pressured to work harder in order to compensate for the loss of production and revenue incurred after a recent ten day shut down. Suddenly, the crew experienced an especially dangerous emergency situation known as a "runaway." The ladle had reached three-quarters of its capacity but the flowing slag could not be stopped because the mudgun was inoperable and manual efforts to close the skim hole had failed. To compound the situation, the consistency of the slag caused it to flow at a faster rate than ever, thus resulting in the worst runaway condition that many of the workers on the site had ever experienced. Respondents could have shut down the furnace, thereby allowing the safe removal of the ladle of slag. However, in order to avoid economic loss, Respondents chose instead to order Delgado, who had never operated a kress-haul under runaway conditions, to attempt to remove the ladle alone, with the molten slag still pouring over its fifteen-foot brim. In doing so, Respondents knew or should have known that Delgado would die or suffer great bodily harm.

{5} When Delgado entered the tunnel, he saw that the ladle was overflowing and radioed White to inform him that he was neither qualified nor able to perform the removal. White insisted. In response to Delgado's renewed protest and request for help, White again insisted that Delgado proceed alone. Shortly after Delgado entered the tunnel, the lights shorted out and black smoke poured from the mouth of the tunnel. Delgado's co-workers watched as he emerged from the smoke-filled tunnel, fully engulfed in flames. He collapsed before co-workers could douse the flames with a water hose. "Why did they send me in there?" Delgado asked co-workers, "I told them I couldn't do it. They made me do it anyway. Charlie sent me in." Delgado had suffered third-degree burns over his entire body and died three weeks later in an Arizona hospital.

{6} The dilapidated kress-haul, recovered after the incident, exemplified the horror of the night's events. The vehicle's windows and tires had melted from the overspilled slag. The caps to the kress-haul's gas tanks were missing and the entire vehicle had burned. Delgado had managed to secure one of the ladle's hooks to the kress-haul before the flames consumed him.

{7} On December 1, 1998, Petitioner filed a complaint in district court against Respondents Phelps Dodge Chino, Inc., White, and Burkett. The complaint stated actions for wrongful death and loss of consortium, prima facie tort, and intentional infliction of emotional distress based on the theory that in ordering Delgado to remove the overflowing ladle, Respondents acted intentionally, with the knowledge that Delgado would be seriously injured and killed as a result of their actions. Respondents filed a motion to dismiss, pursuant to Rule 1–1012(B)(6) ("failure to state a claim upon which relief can be granted"). Judge Jeffreys granted the motion, finding that Petitioner's claims, even if proven true, established only that Respondents "did engage in a series of deliberate or intentional acts which they knew or should have known would almost certainly result in serious injury or death to Reynaldo Delgado, but the complaint falls short of alleging that [they] actually intended to harm Reynaldo Delgado."

{8} In a memorandum opinion, the Court of Appeals affirmed the trial court's decision to grant the motion to dismiss. *See Delgado*, NMCA 20,972, slip op. Citing *Johnson Controls World Services, Inc. v. Barnes*, 115 N.M. 116, 119, 847 P.2d 761, 764 (Ct.App. 1993), and 6 Arthur Larson & Lex K. Lar-

son, *Larson's Workers' Compensation Law* § 103.03 (2000), the Court of Appeals held that the Act provides an employer immunity from tort liability unless the worker's injury stems from the employer's "actual intent" to injure the worker. *See Delgado,* NMCA 20,-972, slip op. at 5. The Court affirmed the dismissal because it agreed with the trial court that Petitioner's complaint failed to allege facts that established actual intent. *See id.* at 6.

{9} Petitioner argues that the Court of Appeals erred in affirming the trial court because: (1) *Johnson Controls* misinterprets the term "accident"; (2) *Johnson Controls* contradicts rules of statutory construction by inserting the requirement of actual intent; (3) intentional acts for purposes of the Act should be defined in the same way as intentional acts in other contexts; (4) the actual intent test creates an absurd result; and (5) the actual intent test violates equal protection. Petitioner asks us to adopt a test that would lift the bar of exclusivity when the employer knows that its conduct is substantially certain to result in the worker's serious injury or death. In the alternative, Petitioner argues that Respondents' conduct satisfied the actual intent test.

 {10} Respondents counter that Petitioner failed to preserve her argument that *Johnson Controls* was wrongly decided, and that, in any case, stare decisis binds this Court to application of the actual intent test. They argue that *Johnson Controls* was decided correctly, that the actual intent test is both well-established and well-reasoned, and that the substantial certainty test proposed by Petitioner must be rejected. Respondents also suggest that the New Mexico Legislature has implicitly approved the actual intent test in a memorial that encourages the judicial branch "to exercise careful judgment to maintain the balance between exclusive remedy and tort law." We decline to interpret this memorial as an endorsement of the actual intent test and therefore do not address it further.

{11} Respondents' argument that Petitioner failed to preserve her position that *Johnson Controls* was wrongly decided also lacks merit. We agree with Petitioner that a trial court is incapable of overruling an appellate court's ruling. Here, Respondent concedes that Petitioner preserved her argument that Respondents were not entitled to exclusivity. Her corollary argument that *Johnson Controls* should be overruled need not have been raised in the trial court, where no ruling on the issue could have been made. Petitioner's argument is properly raised for the first time on appeal. We therefore turn to the merits of that argument.

## II.

{12} When a worker suffers an accidental injury and a number of other preconditions are satisfied, the Act provides a scheme of compensation that affords profound benefits to both workers and employers. The injured worker receives compensation quickly, without having to endure the rigors of litigation or prove fault on behalf of the employer. *See Sanchez v. M.M. Sundt Constr. Co.,* 103 N.M. 294, 296–97, 706 P.2d 158, 160–61 (Ct. App.1985) ("The Act, in effect, is designed to supplant the uncertainties of tort remedies and the burden of establishing an employer's negligence with a system of expeditious and scheduled payments of lost wages based on accidental injury or death in the course and scope of employment.") (citing *Gonzales v. Chino Copper Co.* 29 N.M. 228, 222 P. 903 (1924)). The employer, in exchange, is assured that a worker accidentally injured, even by the employer's own negligence, will be limited to compensation under the Act and may not pursue the unpredictable damages available outside its boundaries. *See* NMSA 1978, § 52–1–9 (1973).[2] The Act represents

---

**2.** Section 52–1–9 reads:

The right to the compensation provided for in this act, in lieu of any other liability whatsoever, to any and all persons whomsoever, for any personal injury accidentally sustained or death resulting therefrom, shall obtain in all cases where the following conditions occur:

A. at the time of the accident, the employer has complied with the provisions thereof regarding insurance;

B. at the time of the accident, the employee is performing service arising out of and in the course of his employment; and

C. the injury or death is proximately caused by accident arising out of and in the course of his employment and is not intentionally self-inflicted.

*See also,* NMSA 1978 §§ 52–1–6 (1990); 52–1–8 (1989).

the "result of a bargain struck between employers and employees. In return for the loss of a common law tort claim for accidents arising out of the scope of employment, [the Act] ensures that workers are provided some compensation." *Coates v. Wal–Mart Stores, Inc.*, 1999–NMSC–013, ¶ 22, 127 N.M. 47, 976 P.2d 999 (citation omitted); *see also Kent Nowlin Constr. Co. v. Gutierrez*, 99 N.M. 389, 390, 658 P.2d 1116, 1117 (1982) (describing exclusivity as striking "a balance between the worker's need for expeditious payment and the employer's need to limit liability."). This "bargain" is based on "a mutual renunciation of common law rights and defenses by employers and employees alike." NMSA 1978, § 52–5–1 (1989).

{13} The Act is subject to abuse from both sides of this *quid pro quo*. An unscrupulous worker, for example, might seek recovery from a self-induced injury, knowing that the Act generally awards compensation regardless of fault. An employer, on the other hand, may abuse the Act by subjecting a worker to injury after determining that the economic advantage of the injurious work outweighs the limited economic detriment that the Act will impose upon the employer after the injury occurs. In part to prevent against such bilateral abuse, the Act limits the availability of compensation only to those workers "injured *by accident* arising out of and in the course of his [or her] employment." NMSA 1978, § 52–1–2 (1987) (emphasis added).

{14} The Act does not define the term "accident," but our courts have come to define it according to its ordinary usage to mean "an unlooked-for mishap or some untoward event that is not expected or designed." *Cisneros v. Molycorp, Inc.*, 107 N.M. 788, 791, 765 P.2d 761, 764 (Ct.App.1988); *see also Aranbula v. Banner Mining Co.*, 49 N.M. 253, 258, 161 P.2d 867, 870 (1945). The Act refines this definition by exemplifying three categories of conduct that will render a worker's injury non-compensable. Under Section 52–1–11, "[n]o compensation shall become due or payable from any employer under the terms of [the Act] in event such injury was occasioned by the intoxication of such worker or willfully suffered by him [or her] or intentionally inflicted by himself [or herself]." The Legislature's refusal to compensate workers for injuries stemming from these three forms of misconduct indicates that the Legislature considered such injuries "non-accidental." This understanding of "accidental injury" finds support in common sense: injuries resulting from intoxication, willfulness, or intentional self-infliction cannot be described as an unexpected consequence of such misconduct.

{15} The Legislature clearly intended to extend employers' privilege of immunity from tort liability, like the worker's privilege of expedited compensation, only to injuries accidentally sustained. Under Section 52–1–9(C), exclusivity applies only when "the injury or death is proximately caused by accident arising out of and in the course of his [or her] employment...." While Section 52–1–11 defines the sort of worker misconduct that will render a resulting injury non-accidental and therefore non-compensable, the Act contains no such provision with regard to employer misconduct.

{16} Rather than using other provisions in the Act to determine when employer misconduct should deprive the employer of exclusivity, our courts have, until now, uniformly deferred to Professor Larson's popular treatise. *See, e.g., Coleman v. Eddy Potash, Inc.*, 120 N.M. 645, 652–53, 905 P.2d 185, 192–93 (1995); *Flores v. Danfelser*, 1999–NMCA–091, ¶¶ 14–15, 127 N.M. 571, 985 P.2d 173; *Johnson Controls*, 115 N.M. at 119, 847 P.2d at 764; *Gallegos v. Chastain*, 95 N.M. 551, 553, 624 P.2d 60, 62 (Ct.App.1981); *Sanford v. Presto Mfg. Co.*, 92 N.M. 746, 748, 594 P.2d 1202, 1204 (Ct.App.1979). In each of these cases, without providing a critical analysis of its legal rationale or repercussions, New Mexico courts ratified Professor Larson's vigorous endorsement of the "actual intent" test for determining whether employer misconduct renders a worker's injury compensable outside the Act. Under this test, "in order to allege matters which will render an employer liable in tort outside the [Act], the plaintiff must allege matters indicating that the employer intended to injure the plaintiff." *Johnson Controls*, 115 N.M. at 119, 847 P.2d at 764. In order to satisfy this burden, in turn, the worker must prove that the employers intended a "deliberate inflic-

tion of harm" upon the employee. *Id.* (citation omitted.).

{17} Several factors have given us cause to re-evaluate the actual intent test. First, the Act declares that "the Workers' Compensation Act ... [is] not to be given broad liberal construction in favor of the claimant or employee on the one hand, nor are the rights and interests of the employer to be favored over those of the employee on the other hand." NMSA 1978, § 52–5–1 (1990). This principle precludes us from interpreting the Act in any way that would favor either the worker or the employer. As demonstrated below, we believe that the actual intent test favors employers.

{18} Second, this case exposes the bizarre policy engendered by the actual intent test. The actual intent test provides immunity from tort liability for all injuries inflicted by the employer except those rare, practically unprovable instances in which it is the employer's purpose to injure the worker. Petitioner accurately observes that this standard provides employers virtually absolute immunity, and "an employer who knows his acts will cause certain harm or death to an employee may escape personal responsibility for an act by merely claiming that he/she hoped the employee would make it." Even more disturbingly, the actual intent test encourages an employer, motivated by economic gain, to knowingly subject a worker to injury in the name of profit-making. As long as the employer is motivated by greed, rather than intent to injure the worker, the employer may abuse workers in an unlimited variety of manners while still enjoying immunity from tort liability. Notwithstanding the fervor with which Professor Larson defends the actual intent test and the near unanimity with which it has been accepted nationwide, *see* 6 Larson & Larson, *supra,* § 103.03D, we are wary of the policy it promotes.

{19} Third and finally, an implicit rejection of the actual intent test in an opinion recently authored by this Court has created inconsistent case law on the matter. *See Coates,* 127 N.M. 47, 976 P.2d 999, 1999–NMSC–013, ¶¶ 29–31. In *Coates,* we held that the plaintiff's tort claims based on sexual harassment were not barred by the exclusivity provisions of the Act. Wal–Mart could be sued outside the Act because, among other significant fac-

tors, its supervisors acted intentionally. *See id.* ¶ 31. We attributed intent to Wal–Mart, despite the absence of any proof that Wal–Mart actually intended to injure the plaintiff, because Wal–Mart knew that one of its supervisors was sexually harassing the plaintiff but failed to take action to stop the harassment. *See id.* Spurred by Section 52–5–1, our uneasiness with the policy precipitated by the actual intent test, and by inconsistent case law on the matter, we now reevaluate the actual intent test.

### III.

{20} As discussed above, the Act limits its scope to accidents, barring both compensation and exclusivity when the worker sustains a non-accidental injury. Because the basis for limiting exclusivity depends on the non-accidental character of the injury, Professor Larson argues:

> the common-law liability of the employer cannot, under the almost unanimous rule, be stretched to include accidental injuries caused by the gross, wanton, wilful, deliberate, intentional, reckless, culpable or malicious negligence, breach of statute, or other misconduct of the employer short of a conscious and deliberate intent directed to the purpose of inflicting an injury.

6 Larson & Larson, *supra,* § 103.03, at 103–5. This passage has been cited with approval by at least two of the cases adopting the actual intent test. *See Johnson Controls,* 115 N.M. at 119, 847 P.2d at 764; *Sanford,* 92 N.M. at 748, 594 P.2d at 1204.

{21} Under this test, employers who intentionally inflict injuries, like workers who do the same, are deprived of their respective benefits under the Act. Thus, the actual intent test treats a worker who suffers an intentionally self-inflicted injury the same as an employer who intentionally inflicts the injury. Assuming that there is no deliberate intent to inflict an injury, however, the actual intent test treats workers and employers differently. Under Section 52–1–11, a worker's willfulness will render a resulting injury non-accidental and non-compensable. Under Professor Larson's approach to exclusivity, however, an injury caused by the *employer's* willfulness is considered accidental, thereby

preserving the employer's immunity from tort liability. Thus, for the purposes of defining "accidental injury," which in turn determines a party's rights available under the Act, the actual intent test creates disparate standards for workers and employers, and biases the Act in favor of the latter. As Petitioners observe, an employer seeking to avoid payment of compensation must satisfy a considerably lower burden of proof (that the injury resulted from the worker's willfulness or intentional self-infliction) than a worker seeking to pursue damages outside the Act (who must prove that the employer possessed a "conscious and deliberate intent directed to the purpose of inflicting an injury").

{22} As if anticipating an attack on the actual intent test, Professor Larson explains:

If these decisions [applying the actual intent test] seem rather strict, one must remind oneself that what is being tested here is not the degree of gravity or depravity of the employer's conduct, but rather the narrow issue of the intentional versus accidental quality of the precise event producing injury. The intentional removal of a safety device or toleration of a dangerous condition may or may not set the stage for an accidental injury later. But in any normal use of the words, it cannot be said, if such an injury does happen, that this was deliberate infliction of harm comparable to an intentional left jab to the chin.

6 Larson & Larson, *supra*, § 103.03, at 103–9. Rather than relieving our concerns regarding the unfairness of the actual intent test, this passage merely rephrases them. According to Professor Larson, in determining whether or not to deprive an employer of immunity we ignore the "degree of gravity or depravity of the employer's conduct" unless it was comparable to "a left jab to the chin," because only then will it be "non-accidental." When determining whether to deprive a worker of compensation, however, we do consider the depravity of the worker's conduct,

and withhold compensation when that conduct reaches a far lower level of intent than that attending a "left jab to the chin."

{23} Under the actual intent test, a single standard of culpability, namely willfulness, will prevent a worker from benefitting from the Act while preserving the corresponding benefits for the employer. This bias violates the explicit mandate of Section 52–5–1, which demands the equal treatment of workers and employers. In keeping with Section 52–5–1, we hereby disabuse New Mexico courts of the notion that an employer will be deprived of tort immunity only when the employer actually intends to injure the worker. We expressly overrule all case law that has required allegation or proof of an employer's actual intent to injure a worker as a precondition to a worker's tort recovery.[3]

## IV.

{24} Under Section 52–5–1, employers seeking exclusivity must be held to the same standard of conduct, and suffer equivalent consequences for a violation of that standard, as workers seeking compensation. *See also* NMSA 1978, § 52–1–10 (1989) (providing an increase in compensation of ten percent for a worker injured due to the employer's failure to provide a safety device required by law or reason and a decrease in compensation of ten percent when the worker's injury stems from his or her own failure to follow statutory safety guidelines or to use a safety device supplied by the employer). In keeping with Section 52–5–1, we hold that the same standard of conduct that our Legislature deemed non-accidental for purposes of depriving a worker of compensation must determine whether an employer's misconduct renders an injury non-accidental for purposes of exclusivity. We hold that when an employer intentionally inflicts or willfully causes a worker to suffer an injury that would otherwise be exclusively compensable under the Act, that employer may not enjoy

---

**3.** Our survey of New Mexico case law indicates that the cases affected by our holding include our own *Coleman* decision, 120 N.M. at 652–53, 905 P.2d at 192–93, as well as *Flores*, 1999–NMCA–091, ¶¶ 12–17, 127 N.M. 571, 985 P.2d 173, *Johnson Controls*, 115 N.M. at 119, 847 P.2d at 764,

*Maestas v. El Paso Natural Gas Co.*, 110 N.M. 609, 611–12, 798 P.2d 210, 212–13 (Ct.App. 1990), *Gallegos*, 95 N.M. at 553, 624 P.2d at 62, and *Sanford*, 92 N.M. at 748, 594 P.2d at 1204 from the Court of Appeals.

the benefits of exclusivity, and the injured worker may sue in tort.

{25} Our courts have promulgated two methods for defining willfulness for purposes of Section 52–1–11. According to *Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 133, 767 P.2d 363, 372 (Ct.App.1988) (citing *Christensen v. Dysart*, 42 N.M. 107, 76 P.2d 1 (1938)), willfulness "requires that the worker have knowledge of the peril and the ability to foresee the injury for which willful misconduct is to blame." Under the test employed in *Gough v. Famariss Oil & Ref. Co.*, 83 N.M. 710, 714, 496 P.2d 1106, 1110 (Ct.App. 1972) (citation omitted), willful misconduct means "the intentioned doing of a harmful act without just cause or excuse or an intentional act done in utter disregard for the consequences."

{26} Combining these tests, and keeping in mind our definition of "accident," we hold that willfulness renders a worker's injury non-accidental, and therefore outside the scope of the Act, when: (1) the worker or employer engages in an intentional act or omission, without just cause or excuse, that is reasonably expected to result in the injury suffered by the worker; (2) the worker or employer expects the intentional act or omission to result in the injury, or has utterly disregarded the consequences; and (3) the intentional act or omission proximately causes the injury.

{27} The first prong presents an objective threshold question. Under this prong, which is informed both by the *Tallman* requirement of foreseeability, *see Tallman*, 108 N.M. at 133, 767 P.2d at 372, and our longstanding definition of "accident," *see Cisneros*, 107 N.M. at 791, 765 P.2d at 764, we determine whether a reasonable person would expect the injury suffered by the worker to flow from the intentional act or omission. We recognize that certain workers, such as firefighters and police, may incur injuries that are reasonably expected, but which nevertheless fail this prong because the intentional act or omission was done with "just cause or excuse."

{28} The second prong requires an examination of the subjective state of mind of the worker or employer. If the worker or employer decided to engage in the act or omission without ever considering its consequences, this prong is satisfied. If, on the other hand, the worker or employer did consider the consequences of the act or omission, this prong will be satisfied only when the worker or employer expected the injury to occur. It will not be enough, for example, to prove that the worker or employer considered the consequences and negligently failed to expect the worker's injury to be among them.

{29} The third prong echoes Section 52–1–11's requirement that in order to render a worker's injury non-compensable willfulness must "cause" the injury. We interpret this causation requirement to refer to proximate cause. *See Estate of Mitchum v.Triple S Trucking*, 113 N.M. 85, 89, 823 P.2d 327, 331 (Ct.App.1991) ("Scrutiny of Section 52–1–11 indicates that our legislature, in enacting legislation establishing the affirmative defense of intoxication, followed the approach taken by a majority of states requiring proof that the worker's intoxication constituted a proximate cause of his or her injury.") (citations omitted).

{30} Respondents warn this Court that any deviation from the actual intent test will "visit an undo hardship upon employers in this State and wreak havoc with New Mexico's workers' compensation system." Even after the scope of exclusivity has been narrowed, the Act continues to provide immunity for negligence. Employer liability for intentional torts will still depend on the worker's ability to prove each element. Because we do not believe that the Act was ever intended to immunize employers from liability for intentional torts, we fail to see the hardship that our holding visits upon employers. *See Turner v. PCR, Inc.*, 754 So.2d 683, 689 (Fla.2000) ("[S]ince the workers' compensation scheme is not intended to insulate employers from liability for intentional torts, and is not to be construed in favor of either the employer or the employee, workers compensation should not affect the pleading or proof of an intentional tort.").

{31} To the extent that this case reflects an adverse development for employers, we remind Respondents that workers, whose

families may depend for livelihood on the compensation received under the Act, have consistently been, and will continue to be, deprived compensation under the same standard we now apply to employers. We also note that under the test presently adopted, employers may avert tort liability by simply refraining from intentionally or willfully injuring workers. Finally, we seriously doubt that employers are willfully injuring their workers with such frequency that the consequence of our decision to expose such employers to tort liability will be to "wreak havoc" with the workers' compensation system. The greater the impact this opinion has on the workers' compensation system, the more profound will have been its need.

## V.

{32} We reverse the Court of Appeals, and remand to the trial court to apply the test announced herein.

{33} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, Chief Justice, JOSEPH F. BACA, Justice, PAMELA B. MINZNER, Justice and PETRA JIMENEZ MAES, Justice.