This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**RENEE C. PINKERTON,**

     Worker-Appellant,

v.                                  **NO. 29, 872**

**STEPHEN GIBBS, D.D.S., P.C.**
**and THE HARTFORD,**

     Employer/Insurer-Appellees.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**Terry S. Kramer, Workers' Compensation Judge**

Gerald A. Hanrahan
Albuquerque, NM

for Appellant

Law Offices of Eva K. Rappaport
Ned S. Fuller
Albuquerque, NM

for Appellees

### MEMORANDUM OPINION

**VIGIL, Judge.**

This is a workers' compensation case. The Workers' Compensation Judge (WCJ) concluded that on July 20, 2007, Worker sustained an accidental injury arising out of, and in the course of, her employment as a dental hygienist; that the accident was reasonably incident to her employment as a dental hygienist; and that she suffered a disability as a natural and direct result of the accident. The WCJ concluded that Worker's injury of focal dystonia, to a reasonable degree of probability, was caused by her work as a dental hygienist with Employer. Dystonia is often brought on by prolonged periods of intense focused activity, which is consistent with Worker's history as a dental hygienist.

However, the WCJ found that Worker failed to meet her burden of establishing a disability resulting from depression due to her work-related injury. Worker appeals and also seeks an award of attorney fees for the appeal. We reverse and remand for entry of a revised Compensation Order and for a determination of the attorney fee award to be made in the first instance by the WCJ.

## I.      BACKGROUND

Worker is a forty-eight-year-old woman who was employed as a dental hygienist by Employer from 1993 until Friday, July 20, 2007, when she was injured on the job. Worker's injury was caused by many years of holding her wrist in an awkward, strained position while working on people's teeth. Worker experienced

2

burning and electrical shock-like pain in her hand and wrist. By the following Monday, Worker was experiencing cramping, numbness, and tingling in her right hand. Until her accident, Worker had not missed a single day of work with Employer (fourteen years).

After the accident, Worker notified Employer of her injury, and Employer exercised its statutory right to select Dr. Steven Weiner as Worker's authorized health care provider (HCP). Dr. Weiner referred Worker to Dr. Baten, and Dr. Baten referred Worker to Dr. Donovan. Additional authorized HCPs and their referrals were Dr. Chun, Dr. Moneim, Dr. Friedman, Dr. Radecki, and Dr. Feldman. None of these doctors were able to correctly diagnose Worker's injury. Focal dystonia is an extremely rare condition, which explains the difficulty in diagnosing Worker's injury.

Worker also continued to see her primary care physician, Dr. Maas, for her general health concerns while seeing the authorized HCPs for her work-related injury. Dr. Maas diagnosed Worker with depression in April 2008. The WCJ found that Dr. Maas is not an authorized HCP.

On May 23, 2008, Worker exercised her statutory right to change her authorized HCP to Dr. Schwartz. Employer did not object to Worker's choice; however, one week later, on May 30, 2008, Employer notified Worker that all benefits were being terminated because it did not consider her injuries to be causally related to Worker's

accident. Worker's total temporary disability (TTD) benefits were therefore terminated as of May 25, 2008. Despite this action by Employer, Worker commenced treatment of her work-related injury with Dr. Schwartz on June 4, 2008.

Worker filed a complaint with the Workers' Compensation Administration ("WCA"). At the hearing, Worker testified and relied on the report of Dr. Donovan as well as the depositions of Drs. Baten and Schwartz to establish a causal connection between her secondary disability of depression and her work-related injury. The depositions were used in lieu of live testimony as required by the WCA Rules. *See Banks v. IMC Kalium Carlsbad Potash Co.*, 2003-NMSC-026, ¶ 28, 134 N.M. 421, 77 P.3d 1014 (noting that regulations exclude a health care provider from giving live testimony at a WCA proceeding, but permits the admission of the deposition itself at the proceeding in lieu of the health care provider's testimony).

In its Compensation Order the WCJ concluded that Worker has a compensable injury of focal dystonia. However, the WCJ also found that "Worker failed to meet her burden establishing a disability resulting from depression due to her work related injury," and that Worker "is not disabled as a natural and direct result of any other conditions including . . . depression."

**II.    STANDARD OF REVIEW**

NMSA 1978, Section 52-1-28(B) (1987) directs:

4

> In all cases where the employer or his insurance carrier deny that an alleged disability is a natural and direct result of the accident, the worker must establish that causal connection as a probability by expert testimony of a health care provider, as defined in Section 52-4-1 NMSA 1978, testifying within the area of his expertise.

To the extent we review the WCJ's interpretation of the statutory requirements, our review is de novo. *See Dewitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 14, 146 N.M. 453, 212 P.3d 341.

On the other hand, the issue of causation is a factual question which is determined by the WCJ in workers' compensation cases. *Ortiz v. Overland Express*, 2010-NMSC-021, ¶ 24, 148 N.M. 405, 237 P.3d 707. We review the factual findings of the WCJ utilizing a whole record standard of review. *Id.* However, because the medical causation evidence was presented by deposition, the WCJ findings on causation are not entitled to the usual deference accorded findings of fact.

> Under certain limited circumstances, a reviewing court has always been able to make independent findings contrary to the fact finder. *See, e.g.*, *Wilson v. Richardson Ford Sales, Inc.*, 97 N.M. 226, 638 P.2d 1071 (1981) (where the trial court's findings are contrary to undisputed evidence in the record); *Martinez v. Universal Constructors, Inc.*, 83 N.M. 283, 491 P.2d 171 (Ct. App. 1971) (where the evidence is documentary or by way of deposition). In these situations, it would seem not to matter whether review is on the record as a whole or under the substantial evidence standard.

*Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 130, 767 P.2d 363, 369 (Ct. App. 1988), *modified on other grounds by Delgado v. Phelps Dodge Chino, Inc.*,

2001-NMSC-034, 131 N.M. 272, 34 P.3d 1148.

In addition, a WCJ is not free to reject uncontradicted medical evidence:

> The uncontradicted medical evidence rule is an exception to the general rule that a trial court can accept or reject expert opinion as it sees fit. The rule is based on NMSA 1978, § 52-1-28(B), which requires the worker to prove causal connection between disability and accident as a medical probability by expert medical testimony. Because the statute requires a certain type of proof, uncontradicted evidence in the form of that type of proof is binding on the trial court.

*Banks*, 2003-NMSC-026, ¶ 35 (quoting *Hernandez v. Mead Foods, Inc.*, 104 N.M. 67, 70, 716 P.2d 645, 648 (Ct. App. 1986) (alterations omitted)).

## III.    DISCUSSION

From our whole record review we conclude that Worker satisfied her burden of establishing a disability resulting from depression due to her work-related injury by presenting testimony of health care providers testifying within their area of expertise.

As a result of the accident on July 20, 2007, Worker lost her ability to work as a dental hygienist, her occupation for eighteen years. Instead of earning $69,000 per year ($1328 per week), she began receiving TTD benefits at $595.67 per week. Employer's insurer terminated TTD benefits and medical treatment on October 28, 2007, and Worker had to file a complaint to have the TTD benefits and medical treatment reinstated. Worker was examined or treated by Dr. Weiner, Dr. Baten, Dr.

Donovan, Dr. Chun, Dr. Moneim, Dr. Friedman, and Dr. Radecki. The medical doctors offered different opinions as to the nature of Worker's injury, and her improvement was nominal. TTD payments and medical benefits were once again terminated by Employer's insurer on May 30, 2008, causing Worker financial distress. Worker was able to find temporary employment from August 2008 until January 2009, as a clerical assistant earning about $500 per week. Within this context, we examine the medical evidence.

**Dr. Donovan's Report**

Dr. Baten referred Worker to Dr. Donovan for a neuropsychological assessment, and Dr. Donovan reported the results of his assessment to Dr. Baten in a report dated April 28, 2008. Dr. Donovan reported that "several interview sessions were punctuated by several trips to the restroom and at least two crying episodes when she described the plight of her condition." Dr. Donovan added:

> She is presently very perplexed by conflicting medical opinions. She reports a loss of motor skills in her right hand, reaching a state of drooping hand and claw hand, creating a situation where, "I could not even tie my shoelaces." She initiated a consultation with neurosurgeon, Dr. Feldman, who according to the patient, said that the "cervical was not an issue." Dr. Baten had previously noted a cervical nerve root compression at C5-6 and Dr. Baum, DO, thought there was "nerve impingement." According to the patient, she had two nerve conduction studies (NCS and EMG?), both by Dr. [Radecki], which seemed to rule-out radiculopathy. Dr. Baten has diagnosed mild carpal tunnel syndrome and this seemed to be confirmed by Dr. [Radecki]'s EMG. On the other hand, Dr. Steven Weiner (Progress Note of 10/09/07) notes that "this

seems more than simply a carpal tunnel problem," and "I am

not sure if a carpal tunnel release would correct that" (08/20/07). To add to this picture, Professor Moneim (UNM) states that, "I see no evidence of carpal tunnel syndrome" and "I am unable to find an anatomical reason," adding that, "she believes that there is some problem with her cervical spine."

It would seem that what the patient describes as a diagnostic ambiguity has had an anxiogenic impact upon her ("I want answers. Work is part of my identity," she says while crying on 04/04/08), which she acknowledges with insight, not the least because it affects her professional career and income. She aptly describes her situation as a "fear of the unknown" so that she could not plan for her future: "How do I cope with the loss of control in my life?"

Dr. Donovan's diagnoses were "Pain Disorder associated with psychological factors and a medical condition . . . [and] Adjustment Disorder with mixed anxiety." Dr. Donovan felt that an appropriate "treatment direction" was a "low dosage mood stabilizer (such as clonazepam) . . . , which could be prescribed either by the treating physician or by means of a psychiatric consultation." Dr. Donovan concluded his report by describing Worker as "perplexed by what she sees as a spectrum of diagnoses, ambivalent about her lawsuit against her employer (Dr. Gibbs) for whom she has worked for many years, uncertain of her future career, and beset by fears of financial distress."

**Dr. Baten's Testimony**

Dr. Baten is licensed to practice medicine in New Mexico, and he is board certified in neurology and clinical neurophysiology by the American Board of

Psychiatry and Neurology. On May 7, 2008, Dr. Baten saw Worker for a follow-up visit. During the visit, Worker presented Dr. Baten with a note from Dr. Maas who had diagnosed Worker with depression. Worker gave the note to Dr. Baten so he could give her a prescription for an antidepressant as Worker's authorized HCP. Dr. Maas' note said that Worker "has depression currently which is in large part due to her stressors related to her lack of use of her right hand and her financial difficulties arising from her unemployment as a result of this disability." Dr. Baten declined to write the prescription, noting

> I explained to the patient that I would not give her an anti-depressant medication to treat a condition for which is out of the scope of my care. I suggested she discuss this with Janeen Maas, M.D., her primary physician. If she is happy to do that, that would be fine. Otherwise I recommend that she have a psychiatrist take care of her medications for this.

While he did not prescribe the antidepressant medication, Dr. Baten testified it was his opinion that Worker suffered depression as a result of her work injury:

> Q.    Dr. Maas stated that Ms. Pinkerton had depression, quote, currently which is in large part due to her stressors related to her lack of use of her right hand and her financial difficulties arising from her [un]employment as a result of this disability. Would you agree with that assessment, disagree with that assessment, or do you have no opinion?
>
> A.    No. I could understand, and I think Dr. Donovan's evaluation supports that.
>
> Q.    So you consider it to be work-related depression?

A.    Right.

Q.    You have somebody who has been in a career 18 years, never misses a day of work, and suddenly they can't perform their work due to the condition of their right wrist?

A.    Correct.

Q.    And after that they get depressed?

A.    Correct.

Q.    And that would be related to the work-related injury and the subsequent problems?

A.    I would say so.

We also note that Dr. Radecki reported to Dr. Baten on February 12, 2008, that Worker's past medical history "is positive for nerve problems related to this difficulty, psychological stressors, as well as thyroid problems."

**Dr. Schwartz's Testimony**

Worker's injury was not diagnosed until she selected Dr. Schwartz, a board certified physiatrist, as her authorized healthcare provider. Worker had already been seen by Dr. Weiner, Dr. Baten, Dr. Chun, Dr. Moneim, Dr. Radecki, and Dr. Donovan. On June 4, 2008, Dr. Schwartz made a diagnosis of "focal dystonia" which, as a matter of reasonable medical probability, was causally related to her work for the past fourteen years as a dental hygienist with Employer.

11

The diagnosis was based on the clinical examination and history. The "Past Medical History" noted by Dr. Schwartz included "[d]epression recently diagnosed with Dr. Maas." Dr. Schwartz also had a copy of Dr. Radecki's report dated February 12, 2008, which noted "[p]ast medical history is positive for nerve problems related to this difficulty, psychological stressors, as well as thyroid problems."

Dr. Schwartz referred Worker to Dr. Harris for a Botox assessment as a possible treatment for the dystonia. After injecting Botox, Dr. Harris noted in her clinical progress note sent to Dr. Schwartz that Worker had "[d]epression and anxiety, under good control with Wellbutrin." Dr. Schwartz also referred Worker to Dr. Lakind, who noted, and reported to Dr. Schwartz, that Worker had a past medical history of depression treated with Wellbutrin. Worker had already seen Dr. Donovan in April 2008, and Dr. Schwartz also had a copy of his report. Dr. Schwartz testified that Dr. Donovan's impression "was that of a pain disorder associated with psychological factors, as well as an adjustment disorder with mixed anxiety."

In the foregoing context, Dr. Schwartz gave the following testimony in her deposition:

> Q. As a matter of reasonable medical probability, do you think there's a causal connection between her depression and this occupational injury or disorder or disease and everything she's been through, through the present?

A. I really do think there is a connection, but I don't know that I'm equipped to say within a reasonable degree of medical probability that there's a causal—that it's the only cause.

Q. Okay.

A. So I would say absolutely there's a connection.

Dr. Schwartz added, "But I hesitate to–based on my expertise because I didn't make the diagnosis, I didn't treat her for it, and so I don't know that I feel comfortable answering that."

**Analysis of the Causation Determination**

Employer argues that Dr. Donovan did not diagnose Worker as having suffered from depression, and that "[o]n the contrary he found that her Beck Anxiety Scale baseline measure was a 6 for depression 'well within normal limits.'" The actual statement in Dr. Donovan's report is under the heading "Psychometrics" and it states, "A mental status evaluation was performed which was within normal parameters. Beck Depression and Anxiety Scales were administered to the patient with scores of 6 and 4 respectively which are well within normal limits." This ignores other notations in Dr. Donovan's report. Dr. Donovan reports that Worker was currently taking Wellbutrin; that her "major psychological stressors" were described as financial, since she was not sure she could pay all of her bills and fear of the unknown in understanding what was happening to her right arm; that Worker had some history

of depression and anxiety at relatively mild levels; that she had a "florid panic episode" preceding a visit to Dr. Maas in mid-March; that a Beck Anxiety Scale for that specific episode showed a score of 42, consistent with a florid panic attack; and that Worker had not commenced Wellbutrin at the time of the panic attack, but did so approximately one week after that episode. We therefore reject Employer's assertion, and review Dr. Donovan's report as a whole, within the context of all the facts of the case.

The WCJ rejected Dr. Baten's causation evidence on the basis of findings that (1) "Dr. Maas is not an authorized healthcare provider"; (2) "Dr. Baten's opinions on depression are based upon the opinions of an unauthorized healthcare provider [Dr. Maas] and are rejected"; and (3) "Dr. Baten's opinions on depression are not well founded and are rejected." This is not a proper basis for rejecting Dr. Baten's testimony even if we agree that Dr. Maas was not an authorized HCP, because our Supreme Court has specifically held that an authorized HCP such as Dr. Baten is entitled to rely on otherwise inadmissible records from a non-HCP physician. *Dewitt*, 2009-NMSC-032, ¶ 33. This does not contravene the rule that only authorized HCPs may give evidence. *Id.*

Employer argues that Dr. Baten was testifying outside his area of expertise because Dr. Baten stated in the note quoted above that he would not give an

14

antidepressant medication to treat Worker for a condition "which is out of the scope of my care." However, Employer provides us with no authority to support its legal assertion. Furthermore, the assertion ignores Dr. Baten's own observations, the medical records before him, and the testimony he gave without any objection from Employer. We therefore reject Employer's argument.

Worker also challenges the WCJ finding concerning Dr. Schwartz that "Dr. Schwartz's opinions on depression are equivocal and inherently contradictory and are rejected." Our whole record review does not support the finding that Dr. Schwartz's testimony is "equivocal" or "inherently contradictory." Her testimony was clear in its assertion that "absolutely" there is a connection between Worker's depression and her occupational injury. We acknowledge she also stated she was unable to testify that the work injury was the "only" cause, and that she was "hesitant" to make a diagnosis of depression because she did not treat her for depression. However, the causal connection in a workers' compensation case does not have to be proved conclusively, and the medical expert is not required to state her opinion in positive, dogmatic language, or in the exact language of the statute. *Gammon v. Ebasco Corp.*, 74 N.M. 789, 794, 399 P.2d 279, 282 (1965). The history and medical records before Dr. Schwartz, which she was entitled to rely on, demonstrate that Worker had depression as a result of her work injury and that she was receiving medical treatment

15

for the depression. We conclude that Dr. Schwartz's testimony, in the context of our whole record review, is sufficient to support a finding of medical causation in this case.

In this regard we note that while the WCJ found that Worker failed to meet her burden of establishing a disability resulting from depression due to her work-related injury, he nevertheless concluded that there is a connection between Worker's focal dystonia and her depression. The WCJ concluded:

> Worker is entitled to reasonable and necessary medical care to include payment for all medical treatment provided, directed or referred by Dr. Schwartz including past and continuing treatment by Dr. Schwartz; past treatment by Dr. Lakind; past and continuing treatment by Dr. Harris, including Botox injections; biofeedback treatment by Genevieve Davis **and future antidepressant medications reasonably necessary to aid Worker's recovery for her physical injury**.

(Emphasis added.)

Based on our de novo and whole record review we find that the evidence does not sufficiently support the WCJ's finding that Worker did not establish a causal connection between the depression and the work-related injury. Rather, our review supports a finding that Dr. Donovan's report and the opinions of Dr. Baten and Dr. Schwartz are well founded, uncontradicted and must be considered. In doing so, we conclude that Worker has met her burden under Section 52-1-28(B) of establishing a causal connection by a probability by expert testimony between her depression and

16

the work-related injury and accident.

## IV.   ATTORNEY FEES

Worker also seeks attorney fees for bringing this appeal.  NMSA 1978, Section 52-1-54 (2003) allows for an award of attorney fees on appeal.  Although we may directly award attorney fees, because an award of attorney fees involves factual determinations, which the WCJ is more suited to decide, we remand to the WCJ to determine whether Worker is entitled to attorney fees for bringing this appeal, and if so, the amount.  *See Dennison v. Marlowe*, 108 N.M. 524, 527, 775 P.2d 726, 729 (1989) (concluding that the contract did not restrict recovery of attorney fees incurred at the trial level, but included attorney fees incurred on appeal, and remanding for the trial court to determine reasonable attorney fees incurred on appeal); *Vinton Eppsco, Inc. of Albuquerque v. Showe Homes, Inc.*, 97 N.M. 225, 226, 638 P.2d 1070, 1071 (1981) (noting that if the statute allows for attorney fees at both trial and appellate levels, the appellate court has discretion to make an allowance of attorney fees on appeal or remand to the trial court for that purpose).

## V.   CONCLUSION

We reverse and remand for entry of a revised Compensation Order consistent with this opinion and for a determination of Worker's attorney fees in bringing this appeal.

**IT IS SO ORDERED.**

_____
**MICHAEL E. VIGIL, Judge**

**I CONCUR:**

_____
**RODERICK T. KENNEDY, Judge**

**CYNTHIA A. FRY, Chief Judge (dissenting)**

**FRY, Chief Judge.**

I respectfully dissent. In my view, the plain language of the governing statute, Section 52-1-28(B), requires affirmance because Worker failed to carry her burden for establishing a causal connection between her depression and her work-related accident.

Section 52-1-28(B) states that in cases where causation is disputed, "the worker must establish that causal connection as a *probability* by expert *testimony* of a health care provider . . . testifying *within the area of his expertise*." (Emphasis added.) In this case, the only health care providers who testified were Dr. Baten and Dr. Schwartz, and neither one of them testified as a probability that Worker's depression was caused by her on-the-job accident. Even if they had, neither one of them would have been testifying within the area of their expertise. Dr. Baten is a neurologist and Dr. Schwartz is a physiatrist. Both of them clearly expressed their lack of expertise in this area. Dr. Baten said he would not prescribe antidepressants for Worker because they would be used to "treat a condition for which [sic] is out of the scope of my care." Dr. Schwartz said that she "didn't make the diagnosis" of depression, "didn't treat [Worker] for it," and thus, that she did not "know that [she felt] comfortable answering" Worker's attorney's questions about the causal connection between Worker's depression and the work-related injury.

The majority attempts to incorporate the diagnoses and impressions of Drs. Donovan and Maas into the testimony of Drs. Baten and Schwartz by relying on *Dewitt* for the proposition that HCPs may rely on the records of non-HCP doctors. This analysis would certainly be appropriate if either Dr. Baten or Dr. Schwartz had relied on the diagnoses of Dr. Donovan or Dr. Maas in reaching their own opinions that there was, as a probability, a causal connection between Worker's depression and the accident. See *Dewitt*, 2009-NMSC-032, ¶ 33 (noting that testifying HCP relied heavily on the non-HCP's records "in arriving at his own opinions"). But I do not think it can fairly be said that Dr. Baten or Dr. Schwartz reached such opinions because both qualified their testimony by noting that the diagnosis and treatment of Worker's depression was outside their area of expertise.

In addition, I am not persuaded by the majority's finding of a causal connection in reliance on (1) the fact that the medical evidence was presented entirely by deposition and (2) the "rule" stated in *Tallman* that an appellate court may make its own "independent findings contrary to the fact finder." 108 N.M. at 130, 767 P.2d at 369. I do not view our case law as stating that we need not accord any deference to the WCJ when the evidence is documentary. This Court in *Tallman* stated that whole record review does not mean that a court may displace the administrative agency's "choice between two fairly conflicting views, even though the court would justifiably

20

have made a different choice had the matter been before it de novo." *Id.* at 129, 767 P.2d at 368 (internal quotation marks and citation omitted); *see Martinez,* 83 N.M. at 284, 491 P.2d at 172 (explaining that on whole record review, "the trial court's finding is to be included in the weighing and review"). The majority believes there was no evidence conflicting with Dr. Baten's and Dr. Schwartz's statements that they thought Worker's depression and her accident were related, and that this justifies reliance on the *Tallman* rule. But in my view, Dr. Baten's and Dr. Schwartz's testimony falls far short of the testimony required by Section 52-1-28(B) and, consequently, the *Tallman* rule is inapposite. Moreover, if the rule were as clear-cut as suggested by the majority, we could simply disregard the WCJ's findings based on expert medical testimony in every workers' compensation case and make our own findings because the applicable regulation requires medical testimony to be by deposition. See NMAC 11.4.4.12(G)(1) (2/19/2010) ("Live medical testimony shall not be permitted, except by an order of the [WCJ].").

I would hold that the WCJ properly applied Section 52-1-28(B) and that substantial evidence in the whole record supports the finding that Worker failed to establish a causal nexus between her depression and the on-the-job injury.

_____
**CYNTHIA A. FRY, Chief Judge**

21